UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

JOSE ALBA,                                                    &

                                            Plaintiff,              **COMPLAINT**

                -against-

THE CITY OF NEW YORK, DETECTIVE WILLIAM              <u>Jury Trial Demanded</u>
GARCIA, NEW YORK COUNTY DISTRICT
ATTORNEY ALVIN BRAGG, DEPARTMENT OF
CORRECTION COMMISSIONER LOUIS MOLINA,
JOHN & JANE DOES 1-20,

                                            Defendants.

------------------------------------------------------------------------ x

## PRELIMINARY STATEMENT

1. Plaintiff Jose Alba is a Hispanic senior citizen and a long-time resident of
Manhattan who, on July 1, 2022, used lawful self-defense against an individual with a criminal
record, Austin Simon, 35, who violently attacked Plaintiff while Plaintiff was working as a clerk
in a Manhattan grocery store/bodega.  During the attack, Plaintiff was also stabbed several times
by Simon's girlfriend, Tina Lee, who had incited Simon to attack Plaintiff because her public
assistance benefit card was not working at the store.  New York County District Attorney Alvin
Bragg and/or his subordinates, following Bragg's policy to achieve "racial equity" in the
Manhattan criminal justice system, charged Plaintiff with murder in the second degree and asked
for high bail at Plaintiff's arraignment.  Despite the fact that Simon and Lee were the initial
aggressors, it was Plaintiff who was arrested, incarcerated, and wrongfully prosecuted.  While in
theory, Bragg's "racial equity" policies are a well-intentioned attempt by him to implement even-
handed justice, the means and methods employed by Bragg have instead had an opposite effect

and resulted in discrimination against certain defendants based on race. Plaintiff's case is a clear and tragic example of this.

2. After the video of Simon and Lee's attack on Plaintiff was shown by the news media, and Plaintiff's arrest, prosecution and incarceration at Rikers Island Correctional Facility became a national story, there was widespread outrage against Bragg and his office for charging a law-abiding, older working man for lawfully defending himself during the crime wave in New York City, caused in part by the massive resignations of New York City Police Officers, and legislation and policies that frustrate the ability for law enforcement to combat crime. Defensively, Bragg responded that he was still investigating the incident, while Plaintiff, who could not pay the high bail for murder in the second degree, suffered at Rikers Island, unaware whether he was facing a long prison sentence for lawful self-defense.

3. Succumbing to the pressure, Bragg subsequently determined, after his investigation, that Plaintiff had acted in self-defense and dismissed the case. However, the information, videos and evidence that conclusively demonstrated that Plaintiff had acted in self-defense was available to Bragg's office before Alba's arraignment. Apparently, for impermissible reasons, Tina Lee was not arrested and prosecuted for stabbing Alba, or for inciting Simon to attack Alba.[1]

4. Plaintiff now brings this civil rights action, pursuant to federal and New York State and City law, asserting claims against: (1) the City of New York; (2) Detective William

---

[1] www.dailymail.co.uk/news/article-11004839/Girlfriend-thug-killed-bodega-worker-WONT-face-charges.html.

www.pix11.com/news/local-news/manhattan/woman-who-allegedly-stabbed-bodega-worker-jose-alba-will-not-face-charges-source.

Garcia, and the presently unidentified police officers and detectives of the New York City Police Department ("NYPD") who participated in the arrest and prosecution of Plaintiff, and the deprivations of Plaintiff's rights arising out of those acts; (3) New York County District Attorney Bragg and the presently unidentified prosecutors in his office who discriminated against Plaintiff because he is Hispanic, unlike Simon and Lee; and (4) Department of Correction ("DOC") Commissioner Louis Molina and the presently unidentified DOC and other municipal officials responsible for the unconstitutional conditions of confinement and inadequate medical care that Plaintiff experienced at Rikers Island.

5. Plaintiff's federal claims are brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1981, the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution, and Title VI of the Civil Rights Act of 1964, which prohibits race discrimination by entities, such as the City of New York and the New York County District Attorney, which are recipients of federal funds.

6. Plaintiff's federal claims against the City of New York are predicated upon the Supreme Court's decision in *Monell v. Dept of Soc. Servs. of City of New York*, 436 U.S. 658, 669, 98 S. Ct. 2018 (1978), specifically District Attorney Bragg's express office policy of what in practice results in race discrimination, and the City's policy, practice and/or custom of unconstitutional conditions of confinement and a lack of adequate medical care at Rikers Island and other DOC jails.

7. Plaintiff further asserts claims under New York common law, the New York City Human Rights Law, and New York City statutory laws, N.Y.C. Admin. Code §§ 8 – 8802 -7, for which a law enforcement defendant has no legal immunity, including qualified immunity. The City of New York is vicariously liable for the individual defendants' violations of Plaintiff's rights

under state and city laws because, at all relevant times, the individual defendants were acting within the scope of their municipal employment.

## JURISDICTION & VENUE

8. This action is brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1981, the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution, and Title VI of the Civil Rights Act of 1964.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.

9. Plaintiff invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear and decide his New York State and New York City claims, which form part of the same case and controversy as Plaintiff's federal claims under Article III of the United States Constitution.

10. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) and (c) because the City of New York and other defendants are located in this District, and because the unlawful acts in question occurred in this District.

## JURY TRIAL

11. Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a jury trial.

## NOTICE OF CLAIM

12. In connection with Plaintiff's claims brought pursuant to New York State and City laws, a notice of claim was duly filed with the City of New York, New York City Health & Hospitals, the New York County District Attorney, and the County Clerk for New York County, within 90 days of the unlawful acts in question, more than 30 days have elapsed since such filing, and the defendants have not adjusted Plaintiff's claims.

13. This action is brought within one year and 90 days of the unlawful acts in question.

**PARTIES**

14. Plaintiff is a resident of the State of New York, a senior citizen, and has no criminal record.

15. The City of New York is a municipal corporation organized under the laws of the State of New York.

16. The individual defendants are Detective William Garcia, and the presently unidentified police officers and detectives of the NYPD who participated in the arrest and prosecution of Plaintiff, and the deprivations of Plaintiff's rights arising out of those acts; New York County District Attorney Alvin Bragg and the presently unidentified prosecutors in his office who discriminated against Plaintiff because of his race and/or color; and DOC Commissioner Louis Molina and the presently unidentified DOC and other municipal officials responsible for the unconstitutional conditions of confinement and inadequate medical care at Rikers Island. The individual defendants acted under color of state law and within the scope of their municipal employment at all relevant times herein. The individual defendants are sued in their individual capacities.

**STATEMENT OF FACTS**

**A. Decision of the Supreme Court in *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141 (2023)**

17. On June 29, 2023, the Supreme Court, in *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141 (2023), explained:

> Eliminating racial discrimination means eliminating all of it. And the Equal Protection Clause, we have accordingly held, applies 'without regard to any differences of race, of color, or of nationality'—it is 'universal in [its] application.' *Yick Wo*, 118 U. S., at 369, 6 S. Ct. 1064, 30 L. Ed. 220. For [t]he guarantee of equal protection cannot mean one thing

5

> when applied to one individual and something else when applied to a person of another color.' *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 289-290, 98 S. Ct. 2733, 57 L. Ed. 2d 750 (1978) (opinion of Powell, J.). 'If both are not accorded the same protection, then it is not equal.' *Id.,* at 290, 98 S. Ct. 2733, 57 L. Ed. 2d 750.

*Id.* at 2161-62.   The Supreme Court further stated in this case that "ameliorating societal discrimination does not constitute a compelling interest that justifies race-based state action."  *Id.* at 2173.

**B. The Public Statements and Policies of New York County District Attorney Alvin Bragg**

18. Alvin Bragg became the District Attorney for New York County in 2022, following his election in November 2021.  Before being sworn in as District Attorney, Bragg was a Visiting Professor of Law and Co-Director of the Racial Justice Project at New York Law School."[2]

19. At his election night victory party, Bragg stated that "under his administration the racial disparities in the criminal justice system would be 'shut down.'"[3]  Bragg  further stated at the party that "getting people out of jail was another urgent priority, making tacit reference to what he called 'a humanitarian crisis' on Rikers Island."[4]

20. On the day that he was sworn in, Bragg stated again that he would "end racial disparities" in the criminal justice system.[5]  Unlawful racial disparities in the criminal justice

---

[2] www.manhattanda.org/meet-alvin-bragg

[3] www.nytimes.com/2021/11/02/nyregion/alvin-bragg-wins-manhattan-da.html?smid=em-share

[4] www.nytimes.com/2021/11/02/nyregion/alvin-bragg-wins-manhattan-da.html?smid=em-share

[5] www.manhattanda.org/alvin-bragg-sworn-in-as-district-attorney-of-new-york-county

system should of course be eliminated, and those who have been historically been subjected to injustice, such as African-Americans, have suffered, but, to remedy past wrongs, governmental policies and practices that discriminate against other racial and ethnic groups are legally impermissible. Racial equity is often defined as equality of outcome, and a District Attorney or other law enforcement official cannot legally obtain equality of outcome without impermissibly considering race and even quotas. *Students for Fair Admissions, Inc,* 143 S. Ct. at 2161-62, 2173.

21. Furthermore, after he was sworn into office, Bragg issued a memo saying that he would not prosecute a list of crimes. These crimes included prostitution, trespassing, resisting arrest and most misdemeanors. Bragg stated that he did this in the "interest of safety and fairness" while noting racial disparities in incarceration.[6] While he was campaigning for District Attorney, Bragg "pledged a culture change in the office, prioritizing public safety and police accountability while declining to pursue many low-level offenses and de-emphasizing conviction rates. Bragg said he'd use data to spot racial disparities in the criminal justice system."[7] Bragg further said during his campaign that "racial equity needed to be a priority and that he didn't believe thievery should be prosecuted since it was a 'crime of poverty." During a May 2021 meeting, Bragg articulated his intention to focus on racial equity instead of prosecuting theft.

22. "A [Bragg] campaign webpage, which has since been scrubbed, said Bragg believed crimes that disproportionately incarcerate Black people are 'morally indefensible' to enforce. 'These cases do not belong in criminal court. The punishments are disproportionately harsh, and fall disproportionately on the backs of people of color. This makes them morally

---

[6]www.newsweek.com/alvin-braggs-soft-crime-policies-face-scrutiny-manhattan-da-goes-after-trump-1789040

[7]www.nbcnewyork.com/news/local/alvin-braggs-opponent-concedes-in-primary-for-manhattan-da/3137640

indefensible,' Bragg stated on his website.  'This is why I will not prosecute most petty offenses through the traditional criminal court system … I will either dismiss these charges outright or offer the accused person the opportunity to complete a program without ever setting foot in a courtroom...'  'In Manhattan, every single step in the way a case is processed from what someone is charged with, to the plea they are offered, to the sentence they are given, is rife with racial disparities,' Bragg said during the 2021 meeting." Furthermore, Bragg's present or former chief prosecutor, Meg Reiss, "who was brought in to Bragg's office, … has advocated to include a critical race theory framework into prosecution years before joining the Manhattan DA." And "[b]efore joining Bragg's office, Reiss created the Institute for Innovation on Prosecution which suggested prosecutors should intentionally undermine the charges police officers bring forward." [8]

23. Whatever the reasons for the number and the nature of crimes committed by individuals of different races, Bragg's statements clearly indicate that he has unlawfully injected considerations of race into how he operates his office, and this was one of the proximate causes of the actions taken against Plaintiff, and the injuries suffered by Plaintiff. Bragg cannot equalize the criminal charges asserted against different race or achieve equity in the incarceration rate (or as Bragg has put it, "shut down" racial disparities in the criminal justice system[9]), without impermissibly considering race. Whatever flaws Bragg perceives in the criminal justice system in Manhattan, the Supreme Court recently stated in *Students for Fair Admissions* that "ameliorating societal discrimination does not constitute a compelling

---

[8] www.foxnews.com/media/alvin-bragg-promises-not-prosecute-theft-establish-racial-equity-agenda-crime-poverty

[9] www.nytimes.com/2021/11/02/nyregion/alvin-bragg-wins-manhattan-da.html?smid=em-share

interest that justifies race-based state action." 143 S. Ct. at 2173. Thus, there is no lawful means for Bragg to achieve his goal of racial equity in the criminal justice system in Manhattan. As stated earlier, racial equity is often defined as equality of outcome, and a District Attorney or other law enforcement official cannot legally obtain equality of outcome without impermissible considerations of race and even quotas. *Students for Fair Admissions, Inc,* 143 S. Ct. at 2161-62, 2173.

24. Before setting forth the facts surrounding the unlawful arrest and prosecution of Plaintiff, there are multiple instances where Bragg implemented policies and practices, and made decisions that unlawfully incorporated race as a factor in the operation of his office. These examples evince heavy-handed prosecutions, disparate treatment, and press releases to stir up the media.

25. One example, widely covered by the news media, was on May 1, 2023, when Daniel Penny, a white 24 year-old male and former United States Marine, allegedly unlawfully took the life of Jordan Neely, a homeless and dangerously mentally ill man, who was terrorizing, threatening and menacing Penny and his fellow passengers on a subway car in Manhattan.[10] Remarkably, like other New Yorkers who are terrified of the dramatic rise in subway crime since the pandemic, Bragg himself stated in an interview that "when one of my family members gets on the train, I, too, get a knot in my stomach."[11]

26. On June 28, 2023, Bragg issued a press release on the Penny case stating in relevant part,

---

[10] www.nypost.com/2023/05/20/daniel-penny-breaks-silence-on-jordan-neely-nyc-subway-death

[11] www.nypost.com/2023/07/12/manhattan-da-alvin-bragg-admits-he-fears-nyc-subway-crime

Manhattan District Attorney Alvin L. Bragg, Jr., today announced the indictment of Daniel Penny, 24, for placing Jordan Neely in a fatal chokehold on the F train. Penny is charged in a New York State Supreme Court indictment with one count of Manslaughter in the Second Degree and one count of Criminally Negligent Homicide. 'Daniel Penny stands indicted for Manslaughter after allegedly putting Jordan Neely in a deadly chokehold for several minutes until and after he stopped moving. I hope Mr. Neely's loved ones are on the path towards healing as they continue to mourn this tragic loss,' said District Attorney Bragg.

27. Bragg and his office apparently decided that the racial element in the Penny case warranted a large prosecution team to rebut the numerous witnesses on the train who corroborated Penny's account of the incident. The press release stated: "The case is being prosecuted by Senior Trial Counsel Joshua Steinglass and Assistant D.A. Jillian Shartrand, under the supervision of Robert Ferrari (Chief of Trial Bureau 40) and Executive Assistant D.A. Lisa DelPizzo (Chief of the Trial Division). Analysts Emma Lester, Ryan Strick, Brandon McDuffie, and Kevin Ferrari all assisted with the case."[12]

28. Another widely covered example of Bragg and his office implementing disparate treatment based on race is the case of Miya Ponsetto, a 23 year-old resident of California, who the media and others derisively have nicknamed, "SOHO Karen." Although the incident seemed to consist of a minor physical altercation arising from a dispute over a cellphone, and absolutely no evidence that Ponsetto was motivated by race, Bragg, despite the scarce law enforcement resources at the present time and the crime wave, had officers fly to California to

---

[12] www.manhattanda.org/d-a-bragg-announces-manslaughter-indictment-of-daniel-penny-for-the-death-of-jordan-neely

arrest Ponsetto and bring her back to New York City for a hate crimes prosecution.  While allegedly exhibiting uncouth and disorderly conduct in the incident, Ponsetto denied any racial animus, and in fact, no evidence supported the notion that her actions were motivated by race, let along meeting the legal requirements to classify an act as a hate crime.  In fact, Ponsetto, who is part-Filipino, accused others, of various racial backgrounds, of stealing her phone prior to the complainant in her case.

29. On April 11, 2022, Bragg issued a press release stating in relevant part:

> Manhattan District Attorney Alvin L. Bragg, Jr., today announced the guilty plea of Miya Ponsetto, 23, for falsely accusing a Black teenager of stealing her cellphone, and then attacking him at the Arlo SoHo Hotel in December 2020.  Ponsetto pleaded guilty to Unlawful Imprisonment in the Second Degree as a Hate Crime.  Under the terms of the plea, Ponsetto will be required for two years to abide by the terms of her California probation stemming from a separate case, continue counseling, and avoid further interaction with the criminal justice system. If Ponsetto successfully follows these terms, she can then replead to Aggravated Harassment in the Second Degree, a class A misdemeanor.  If she does not comply, she faces up to 1 1/3 to 4 years in state prison.   'Ms. Ponsetto displayed outrageous behavior.   As a Black man, I have personally experienced racial profiling countless times in my life and I sympathize with the young man victimized in this incident.   This plea ensures appropriate accountability for Ms. Ponsetto by addressing underlying causes for her behavior and ensuring this conduct does not reoccur,' said District Attorney Bragg.

30. The press release contains no facts as to how Ponsetto engaged in racial profiling, as stated by Bragg, or any allegations that Ponsetto used racial slurs during the incident.[13] Moreover, Bragg made this inappropriately personal by injecting his own experiences as a youth in the press release.

31. Like the case against Daniel Penny, a large prosecution team was put on Ponsetto's case.  According to Bragg's press release, "Assistant District Attorneys Sarah Marquez and Stephanie Ritter handled the case under the supervision of Jeanne Olivo and Hannah Yu; assisted by Trial Preparation Assistant Molly Ketterer and analysts Sasha Hodson, Alexandria Pontious, and Lydia Culp.  DANY Investigators Ralph Hanna and Jeff Salta, and Detectives Kenneth Rosello and Alistair Bascom from NYPD also assisted with the case."

32.  Bragg's press release for the Ponsetto case further stated that Ponsetto will face a prison sentence "if she does not comply" with the terms of her sentence.  Because of Ponsetto's race, she was not eligible for Bragg's written policy that in "any case in which a person violates the terms of a non-carceral sentence or pre-plea programming mandate, the Office will seek a carceral 'alternative' only as a matter of last resort."[14]

33. Ponsetto and Penny were also not eligible for Bragg's written "Restorative Justice" policy due to their race.

34. Although 24 year-old Daniel Penny and the 23 year-old Ponsetto met the age criteria, Bragg's office did not apply his written policy of leniency for young offenders under 25

---

[13] www.manhattanda.org/d-a-bragg-announces-guilty-plea-of-miya-ponsetto-for-attacking-black-teenager-at-arlo-hotel

[14] www.manhattanda.org/wp-content/uploads/2022/01/Day-One-Letter-Policies-1.03.2022.pdf (Policy Memo. at 6).

years-old.  Upon information and belief, this was due to the disparate treatment they faced due to

their race. In Bragg's Day One Letter to his staff, Bragg wrote, in relevant part,

> Research shows that brain development continues
> until up to age 25, youth are physiologically subject
> to more impulsive behavior, and are still capable of
> growth and maturation.  Prosecuting youth in our
> adult criminal court system can lead to recidivism,
> making neighborhoods less safe.
>
> Well-designed initiatives that support and stabilize
> people – particularly individuals in crisis and youth
> – can conserve resources, reduce re-offending, and
> diminish the collateral harms of criminal
> prosecution.

Bragg's policy further states

> For those cases involving adults under the age of 25,
> ADAs should make an individualized determination
> of the appropriate outcome for each case recognizing
> that the same brain development variables that
> illuminate our views on juveniles should play a role
> in our determinations of young adult cases.  Some
> offenses committed by persons in this age range are
> attributable to lack of impulse control, peer pressure,
> and the lack of insight and appreciation of
> consequences that comes with age. Therefore, ADAs
> prosecuting those under the age of 25 should
> consider dispositions aimed at rehabilitation,
> including reducing charges, offering deferred
> prosecution, or offer pleas that permit a person to
> avoid a criminal record, depending on the
> circumstances of each case including the input of
> victims.[15]

35. Seemingly because of their race, Ponsetto now has a criminal record in New

York, and Penny is facing a criminal record and incarceration.

---

[15]www.manhattanda.org/wp-content/uploads/2022/01/Day-One-Letter-Policies-1.03.2022.pdf
(Policy Memo. at 1-3, 7).

**C. The Arrest, Prosecution & Incarceration of Plaintiff**

36. On July 1, 2022, Plaintiff, who worked at the Blue Moon convenience store, located at 3422 Broadway in Manhattan, was falsely arrested by NYPD officers and charged with murder in the second degree pursuant to Penal Law § 125.25(1).  Plaintiff had worked for Blue Moon for approximately three (3) years, usually on the overnight shift, and seven (7) days per week.

37. Plaintiff was arrested after career criminal Austin Simon came into the store, at the urging of Simon's girlfriend Tina Lee, who was angry with Plaintiff because her government benefit payment method was declined when she tried to purchase potato chips.  Lee was screaming at Plaintiff  and told Plaintiff that she was going to get Simon to attack him.

38. When Simon entered the store minutes later, he placed Plaintiff in reasonable fear of imminent deadly harm and serious physical injury through his actions and statements. Plaintiff, with legal justification, defended himself.  Plaintiff was 61 years-old at the time, 5 feet, 6 inches tall, and had no criminal record or arrest history.  Simon was 35 years-old, over 6 feet tall, much larger in stature than Plaintiff, and a career criminal.

39. Simon went behind the counter where Plaintiff was standing, and asked Plaintiff in a threatening tone what he had done to Tina Lee's child.  Simon also pushed Plaintiff on his chest causing Plaintiff to fall onto a chair, and pulled Plaintiff out from behind the counter.

40. Plaintiff observed that Lee had obtained a long knife and concluded that Simon and Lee, both of whom were screaming at Plaintiff, were going to kill him. Plaintiff grabbed a knife near the counter to protect himself as Simon was hitting him.  Simon and Lee cut Plaintiff several times with the knife.

41. Plaintiff then used his knife on Simon to protect himself. Simon collapsed and Plaintiff told a customer to call the police.  The incident was captured on video on the Blue Moon video surveillance system.

42. Several unidentified NYPD officers arrived minutes later, and Simon received on-site medical attention.  Detective William Garcia and other detectives then arrived on the scene. The detectives and officers did not speak to Plaintiff about what happened, and simply arrested him.  The detectives and officers also did not speak to any witnesses or customers in the store to determine what had occurred.  The detectives and officers did not have probable cause to arrest Plaintiff and did not tell Plaintiff the reason why he was being arrested.  Furthermore, Lee was not arrested, despite the crimes she committed in stabbing and attacking Plaintiff, and inciting Simon to harm Plaintiff.

43. Despite Plaintiff's visible stab wounds, the detectives and officers took Plaintiff to the 30th Precinct, rather than the hospital.  The first responders treating Simon at the scene did not provide medical treatment to Plaintiff.  At the 30th Precinct, the detectives and officers fingerprinted Plaintiff and took photos, including of his injuries.  Plaintiff was put into a detention room while he was still bleeding.

44. Plaintiff was interrogated at the precinct by Detective Garcia and others before being taken for medical care.  Plaintiff told Detective Garcia that Tina Lee told him to "suck his dick" and that she was going to have Simon attack him before leaving the bodega to get Simon. Plaintiff further told Detective Garcia and others that he told Simon that he did not want any trouble, that Simon grabbed Plaintiff by his shirt and "dragged" him out from behind the counter, and that Lee began stabbing Plaintiff.

45. Approximately one to two hours later, Plaintiff was taken to Harlem Hospital, where he received sutures to the stab wounds.  After being treated at the hospital, the detectives and officers took Plaintiff back to the precinct and then to Manhattan Central Booking.

46. Plaintiff was charged with murder in the second degree in a Criminal Complaint signed by Detective Garcia.  Garcia and those acting in concert with him, including District Attorney Bragg or a high-level official in his office, misrepresented the video of the incident to put forward a false narrative so Plaintiff could be charged with murder, and further Bragg's goal of racial equity.  Detective Garcia stated in the Criminal Complaint, which was drafted by District Attorney Bragg and/or his subordinates who were following Bragg's discriminatory policies, as follows::

> I reviewed surveillance video from the store depicting the following:
>
> At approximately 11:05 PM, Mr. Simon entered the area behind the counter.  Mr. Simon was carrying a small white towel in his left hand and his right hand was empty.  Mr. Simon pushed the defendant once and spoke to him while the defendant sat in a chair behind the counter.  Mr. Simon then put the towel in his pocket and attempted to steer the defendant out of the area behind the counter, but the defendant picked up a kitchen knife that was stashed behind the counter and stabbed Mr. Simon in the neck and chest at least five times. Informant [Tina Lee] attempted to pull the defendant away from Mr. Simon and held the defendant's right arm but the defendant continued to stab Mr. Simon. Informant then took a knife from her purse and stabbed the defendant's arm.  Mr. Simon fell to the ground, face-down and bleeding.

47. To further the goal of racial equity, the above false narrative in the Criminal Complaint made Plaintiff appear culpable for a crime he did not commit, and minimized Simon's conduct so that Simon could be characterized as the victim.  Plaintiff was charged with murder in

the second degree, instead of lesser included offenses such as manslaughter, which would have resulted in substantially lower bail.

48. District Attorney Bragg and his subordinates did not follow Bragg's policy of charging Plaintiff with lesser included offenses, such as voluntary or involuntary manslaughter, because of race.  Bragg's written policy states:

> ADAs shall presumptively indict both top counts and lesser included counts when presenting cases to the grand jury, permitting a wider range of statutorily permissible plea bargaining options. This presumption can be overcome with supervisory approval.[16]

49. As a result of the misrepresentations and withholding of exculpatory information by Detective Garcia and the NYPD, detailed below, coupled with District Attorney Bragg's discriminatory policies, prosecutors asked the judge at Plaintiff's arraignment that Plaintiff be held on $500,000 bail or bond, although he had no criminal record and strong community ties  The judge set bail at $250,000 cash or $500,000 bond.

50. Plaintiff could not post the high bail and was taken to Rikers Island Correctional Facility.  At Rikers Island, Plaintiff was held under inhumane and unconstitutional conditions, particularly in the intake area, and was not provided with protection from contracting Covid-19 and other infectious diseases.  Plaintiff was in an intake cell for approximately two days.  The New York Post has published photos of the horrible conditions in the intake cells, which speak for themselves.[17]  This is one of the photos:

---

[16]www.manhattanda.org/wp-content/uploads/2022/01/Day-One-Letter-Policies-1.03.2022.pdf (Policy Memo. at 5).

[17]www.nypost.com/2021/10/21/photos-inside-rikers-island-expose-hellish-deadly-conditions
www.nypost.com/2022/09/28/images-reveal-more-deplorable-conditions-at-rikers



These conditions are plainly unconstitutional. *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) ("[T]o establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive *risk* to health or safety.") (emphasis added); *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) ("We have held that prisoners may not be deprived of their 'basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety' — and they may not be exposed 'to conditions that 'pose an unreasonable *risk* of serious damage to [their] future health.'") (emphasis added); *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("correctional officials have an

---

www.nypost.com/2023/04/19/nyc-agrees-to-shell-out-53m-to-inmates-held-in-harsh-conditions-on-rikers-island

affirmative obligation to protect inmates from infectious disease."); *Benjamin v. Fraser*, 161 F. Supp. 2d 151 (S.D.N.Y. 2001) (unconstitutional conditions at Rikers Island); *Benjamin v. Malcolm,* 803 F.2d 46, 54 (2d Cir. 1986) ("[T]he record supports the existence of conditions [at Rikers Island] meeting well-established standards for issuance of preliminary relief"); *Doe v. Kelly*, 878 F.3d 710, 715 (9th Cir. 2017) ("[D]etention facilities must provide individuals held overnight with beds and mattresses, and, thus, the absence of either violates the detainees' due process rights"); *id.* at 716 ("[A] sanitary environment is a basic human need that must be met by all penal institutions"); *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015) ("Finally, the district court's imposition of a third requirement— that an inmate 'claim[] that he suffered sickness or other ill effects' to establish a violation — fares no better.  Although the seriousness of the harms suffered is relevant to calculating damages and may shed light on the severity of an exposure, serious injury is unequivocally not a necessary element of an Eighth Amendment claim.").

51. In July 2023, the United States Attorney for the Southern District of New York, Damian Williams, "said in a statement the feds can no longer wait for 'substantial progress' to be made on Rikers, and his office would seek a powerful court-appointed receiver to address the horrid conditions.  'Rikers Island has been in crisis for years,' the Biden appointee said.  'This is a collective failure with deep roots, spanning multiple mayoral administrations and DOC commissioners.  But after eight years of trying every tool in the toolkit, we cannot wait any longer for substantial progress to materialize.'"[18] Bragg was aware of the horrid conditions at Rikers Island at the time that Plaintiff was arrested, describing Rikers as a "humanitarian crisis" and an "ongoing crisis."[19]

---

[18] www.nypost.com/2023/07/17/manhattan-federal-prosecutor-calls-for-federal-takeover-of-rikers

[19] www.nytimes.com/2021/11/02/nyregion/alvin-bragg-wins-manhattan-da.html?smid=em-share
www.manhattanda.org/wp-content/uploads/2022/01/Day-One-Letter-Policies-1.03.2022.pdf
(Letter at 3).

52. When he charged Plaintiff with murder and sought high bail, Bragg stated that he was still investigating the case, which deprives Bragg and his subordinates who worked on the case of absolute immunity. *See Zahrey v. Coffey*, 221 F.3d 342, 347 n.2 (2d Cir. 2000) ("All members of the [Supreme] Court recognized, however, that a prosecutor's conduct even after probable cause exists might be investigative."); *Hill v. City of N.Y.*, 45 F.3d 653, 661 (2d Cir. 1995) ("When a district attorney functions outside his or her role as an advocate for the People, the shield of immunity is absent.  Immunity does not protect those acts a prosecutor performs in administration or investigation …"); *Morse v. Fusto*, 804 F.3d 538, 548-49 (2d Cir. 2015).  Bragg stated he had "not committed" to prosecuting Alba and "We are continuing to review the evidence and the investigation is ongoing."[20]

53. Because of the races of Plaintiff and Simon, Bragg knowingly allowed Plaintiff to suffer at Rikers Island while he investigated, and he did not charge Alba with a lesser crime than murder at his arraignment, such as manslaughter, which would have resulted in much lower bail, which Alba could have posted.  Plaintiff has strong community ties, is a United States citizen, and has lived in New York City for 35 years.  Plaintiff was not a flight risk and was not a danger to anyone, as he was a senior citizen with no criminal record.

54. Because of the races of Alba and Simon, District Attorney Bragg and his subordinates did not follow Bragg's policy of deferring prosecution where further investigation was warranted.  The policy states:

---

[20]www.ny1.com/nyc/all-boroughs/news/2022/07/19/manhattan-da-set-to-dismiss-murder-charges-against-harlem-bodega-worker
www.wsj.com/articles/bodega-owners-push-manhattan-district-attorney-to-drop-charges-against-jose-alba-11657804661?reflink=desktopwebshare_permalink
www.independent.co.uk/news/world/americas/crime/nyc-bodega-stabbing-jose-alba-b2118783.html

> Prosecution may be deferred if the discovery available at the time of arraignment is so sparse, or so potentially voluminous, that the ADA believes it poses a significant risk that the Office will not meet its discovery requirements in arraigning the case immediately, provided that doing so poses no public safety risk. Delaying a case while we gather all the evidence and make sure it is appropriate to file an accusatory instrument will ensure that we are in full compliance with the letter and spirit of discovery requirements.[21]

55. Hours after his arrival at Rikers Island Plaintiff was taken to a Riker's clinic where it was determined that Plaintiff's stab wounds had to be cleaned twice daily and that he needed medication to prevent or cure an infection and alleviate pain. Despite Plaintiff's numerous requests, the correction officers and medical staff at Rikers Island did not ensure that Plaintiff received the recommended treatment and medication. Correction officers only took Plaintiff for follow-up care one time during his entire incarceration.

56. On July 7, 2022, after a lower bail package was arranged due to the public outrage against Bragg, Plaintiff posted bail and was released from Rikers Island. Mayor Eric Adams told the news media: "We had an innocent hard-working New Yorker that was doing his job, and someone was extremely aggressive towards him."[22]

57. Succumbing to the national outrage that resulted from the arrest and prosecution of an innocent man protecting himself during a crime wave, Bragg filed a motion to dismiss the criminal charges, dated July 19, 2022, which essentially concluded that Simon was the initial aggressor and that Plaintiff had lawfully defended himself. **This conclusion was based on**

---

[21]www.manhattanda.org/wp-content/uploads/2022/01/Day-One-Letter-Policies-1.03.2022.pdf (Policy Memo. at 3).

[22] www.nypost.com/2022/07/19/alvin-bragg-to-drop-charges-against-bodega-worker-jose-alba

**evidence that was available to Detective Garcia, the other police officers and detectives involved, and the District Attorney and his subordinates, before Plaintiff was arraigned**. Further, there was no explanation in the motion for the decision to not arrest and prosecute Tina Lee for stabbing Plaintiff and inciting Austin Simon to attack Plaintiff.

58. The District Attorney's motion, in contrast to the false Criminal Complaint, stated that the District Attorney's investigation revealed:

- Simon started the physical altercation.

- "Minutes after the girlfriend left angrily, Simon came to the store, **entered the small, employees-only area** behind the counter, **shoved Alba against a wall of shelving, and grabbed him by the collar to lift him out of a chair and force him out of the employees-only area** …"

- Tina Lee stated to Claimant  "Now, my [expletive] gonna come down here right now and **fuck you up**."

- "About five minutes later, at approximately 11:05 p.m., Simon arrived at the Blue Moon, followed by his girlfriend and her daughter.  Simon came into the store and can be heard on the surveillance tape repeatedly saying from outside the counter area, '**Come on, come out**,' to Alba, and motioned with his hands for Alba to exit from behind the counter."

-  "Alba **did not leave the area behind the counter**, and the surveillance video records him saying, '**I don't want a problem, papa**.'  Alba is 61 years old and 5 feet, seven inches tall.  Simon was 35 years old and 6 feet tall.  Simon entered the open door that leads into the small private area behind the counter, said '[Expletive], what's wrong with you?  Why you snatch anything out of her hands,' and moved to **within inches** of Alba's body."

- "When Alba continued to serve a customer, Simon **forcefully pushed Alba against a wall of shelving. Alba's back struck the shelving and he fell into a seat in front of it**."

- "Alba **stayed where he had been pushed, was silent, and averted his gaze**."

- "Simon stood **directly in front of Alba, inches away, and gesticulated and yelled** …"

- Simon had a boxcutter on him.

- "Simon **grabbed Alba by the back of the collar, lifted him from where he had been thrown, and forcibly moved Alba** from the back of the counter area towards its door."

- "With Simon **holding Alba by the collar and pushing him out of the counter area**, Alba reached down for a knife kept on a shelf beside the counter."

- "**Simon's conduct in entering the store's small, private area, throwing Alba against the wall to a place he could not escape, and grabbing him by the collar could inspire deep fear in an older and shorter man as to what might be in store next. This was also in the context of the girlfriend saying five minutes earlier that her boyfriend was going to 'come down here right now and fuck you up**.'"

59. All of the above facts, which were available to defendants when Plaintiff was arrested, and before Plaintiff was charged with murder and arraigned, should have precluded an arrest and prosecution for murder or any other crime. Bragg and his subordinates apparently did not see a basis for any charges whatsoever, including manslaughter, as they moved to dismiss the sole charge of murder and did not amend the Criminal Complaint to add other charges.

60. The judge in criminal court granted the District Attorney's motion to dismiss the murder charge. Tina Lee has yet to be arrested and prosecuted for stabbing Plaintiff and for inciting Austin Simon to attack Plaintiff. **This caused Mayor Adams to comment: "Anyone who carries out an assault of any nature should be held accountable for it. So if in that video it determines that she broke the law, I believe that the law must be enforced. But the district attorney makes the final outcome. My job is to continue to stand up and support those hard working New Yorkers that should not be the victim of aggressive behaviors."**[23]

61. Plaintiff has been unemployed since the incident and is being supported by his sons. Plaintiff fears that if he obtains another position at a bodega, Simon's fellow gang members or friends will seek vengeance and attack or kill him. Plaintiff's damages include, among other

---

[23] www.nyc.gov/office-of-the-mayor/news/496-22/transcript-mayor-eric-adams-office-special-enforcement-lawsuit-against-illegal

injuries, emotional distress, fear and anxiety from his arrest, prosecution and incarceration; physical ailments and pain and suffering from the attack on him and the conditions and lack of medical care at Rikers Island; loss of enjoyment of life; damage to reputation; financial loss; and a loss of liberty from the arrest, prosecution and incarceration.

### D. *Monell* claims against the City of New York for the Conduct of the District Attorney

62. Under *Monell*, a municipality is liable for the acts of its final policymakers.  For *Monell* purposes, a district attorney is a final policymaker for a municipality for the district attorney's acts as the manager, administrator and creator of policies and practices for the district attorney's office.  *Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 536 (2d Cir. 1993); *Myers v. Cty. of Orange*, 157 F.3d 66, 76-77 (2d Cir. 1998); *Fraser v. City of N.Y.*, No. 20-CV-04926, 2021 U.S. Dist. LEXIS 69324, at *27-32 (S.D.N.Y. Apr. 9, 2021) ("The Second Circuit recently held that New York City is the proper defendant for constitutional violations resulting from allegedly unlawful policies enacted by the Queens District Attorney's Office."); *Id.* ("[D]istrict courts in this Circuit have consistently refused to dismiss *Monell* claims alleging that a county prosecutor's office has sanctioned an unlawful practice*.")*; *Galgano v. Cty. of Putnam*, No. 16-CV-3572 (KMK), 2020 U.S. Dist. LEXIS 116682, at *34-39 (S.D.N.Y. July 2, 2020) ("Clear precedent thus establishes that a municipality may be liable for the individual unconstitutional actions of a policymaker, even where that policymaker is a district attorney."); *O'Hara v. City of N.Y.,* No. 17-CV-4766, 2019 U.S. Dist. LEXIS 91551, at *27 (E.D.N.Y. May 31, 2019); *Kellner v. City of N.Y.*, No. 17-CV-1268, 2021 U.S. Dist. LEXIS 177698, at *52-58 (E.D.N.Y. Sep. 16, 2021).

63. Although Bragg's discriminatory policies and practices, as detailed in this pleading, were applied to many individuals other than Plaintiff, including Daniel Penny and Miya Ponsetto, "a single act could form the basis of municipal liability . . . [s]o long as the single

challenged act was the decision of a municipal policymaker." *Walker v. City of New York*, 974

F.2d 293, 296 (2d Cir. 1992); *see also Canzoneri v. Incorporated Vill. of Rockville Ctr.*, 986 F.

Supp. 2d 194, 204 (E.D.N.Y. 2013) ("It is well settled that municipal liability may be established

based on the single acts of a municipal official with 'final policymaking authority …'") (collecting

cases).

**E. *Monell* claim against the City of New York for the Conduct of the Department of Correction and Claims against Commissioner Louis Molina and his Subordinates**

64. The City of New York, via the DOC and its final policymakers, including DOC

Commissioner Louis Molina, have created and maintained a municipal policy, practice and/or

custom of mismanagement of DOC personnel, intentional chronic absenteeism, the absence of

prompt and effective discipline, and intentional work stoppages.  The City, Commissioner Molina

and his subordinates have created an environment where inmates are not adequately supervised

and managed; inmates die in custody from suicide, attacks and illness; injured and ill inmates are

not taken for medical attention; squalid conditions of confinement are not addressed, DOC staff

and inmates are frequently the victims of assaults, inmates are held beyond the dates they are

required to be release, and inmates are held for long periods in the horrid intake cells waiting for

a space in a housing block.

65. Staffing and poor management of staff are some of the main problems causing

these  conditions.  As the *New York Times* reported on December 31, 2021,

> The leaders of the New York City Department of
> Correction had already lost control over Rikers
> Island this fall when they went in search of one small
> measure of relief.  They needed 19 correction
> officers whom they had posted at the Queens
> criminal courthouse to fill in at the massive jail
> complex, where staffing was short, slashings and
> stabbings were up and detainees had gained control
> over some housing units.  It was Columbus Day, a

holiday, and the workload at the Queens courthouse was comparatively light.  But when the bus to Rikers arrived at the courthouse, many of the guards refused to board it.  Instead, according to interviews, they claimed the onset of sudden illness.  Seven of them dialed 911, complaining of chest pain, leg injuries, lightheadedness and palpitations.  One produced a cane as proof of disability.  More than a dozen officers left in ambulances.  Rikers remained understaffed.  The Columbus Day episode underscores how easy New York City's leaders have made it for jail guards to sidestep assignments they do not want, even as Rikers Island has been gripped by its worst crisis since it reeled from the crack epidemic in the early '90s.

The powerful correction officers' union has said that hiring more guards would solve the problems. But records and interviews show that there is no staffing shortage in the jail system. In fact, on days this year when guard posts in volatile Rikers housing units went unfilled, hundreds of other correction officers were stationed elsewhere in less dangerous positions, including as secretaries, laundry room supervisors and even bakers.

The groundwork for the violence and disorder on Rikers was laid over the years by successive mayoral administrations, which allowed power to shift to lower-level wardens and the guards' union and then to incarcerated gang members themselves.  As a result, guards have been posted throughout the system in wasteful and capricious ways, generous benefits like sick leave have been abused and detainees have had the run of entire housing areas.  A New York Times investigation — drawing on confidential memos and other internal city documents, hundreds of pages of public records and interviews with more than five dozen city officials, correction employees, detainees and their lawyers — has found official missteps going back decades.

For years, mayors and correction commissioners have allowed jail managers to place the least experienced officers in charge of detainee dorms and cells, posts that are critical for keeping order but

viewed by many as the least desirable assignments in the system.   The managers, who base staffing decisions on seniority, department custom and office politics, have also filled the jobs with guards who have fallen out of favor with administrators, reinforcing the idea that they are punishment posts to be avoided. \

When those guards in the housing units have fallen ill, gotten injured or been barred from contact with incarcerated people for other reasons, other rules adopted by city leaders have made finding replacements unusually difficult.

Every mayoral administration since John Lindsay's in the 1970s has signed union contracts granting unlimited sick leave to guards and the city's other uniformed workers.   And records and interviews suggest that abusing it can carry few consequences: It can take more than a year for the department to bring discipline charges against an officer who is caught abusing sick leave.[24]

66. When the defendants and other City leaders were informed that their policies, practices and lack of action could lead to dangerous breakdowns, they failed to act on the warnings. In February 2018, the office of Mayor Bill de Blasio's top criminal justice adviser presented the first deputy mayor, Dean Fuleihan, with a memo that stated that high rates of absenteeism among

---

[24]www.nytimes.com/2021/12/31/nyregion/rikers-island-correction-officers.html   *See also* www.nytimes.com/2022/05/17/nyregion/nyc-correction-department-rikers.html   ("A recent investigation by *The New York Times* also found that many officers who do come to work have been assigned jobs that include little contact with detainees. The New York City Correction Department has the highest staff-to-detainee ratio of any jail system in America, but hundreds of officers worked as secretaries and laundry room supervisors, while dozens of housing areas were left unguarded, The Times found."); www.nytimes.com/2021/12/31/nyregion/rikers-island-correction-officers.html   ("Guards act as drivers for wardens. Guards answer phones and file papers for administrators. Guards supervise lawn-mowing crews. Guards oversee tailor shops. Guards help run a bakery.").

guards might be driving a rise in jail violence — and recommended steps to stabilize staffing and reduce violent incidents.  These steps were never taken and the memo has not been made public.[25]

67. All of the aforesaid "failures are especially stark given the vast sums the City has spent on the Correction Department.  At an annual cost to taxpayers of more than $400,000 per inmate — more than six times the average in the nation's other biggest cities — New York has operated a jail complex that has broken down in fundamental ways, leaving some detainees to roam unsupervised and others to go without food or basic health care."

68. The problems continue to persist. The *New York Times* on June 10, 2022:

> In a major concession to the City Council, Mr. Adams dropped his effort to substantially expand Correction Department spending. Although the department does not have a staffing shortfall, chronic absenteeism among correction officers and mismanagement had contributed to what a federal monitor has called chaotic and dangerous conditions at the Rikers Island jail complex.  The mayor originally sought to hire 578 additional officers, a major increase but also a fraction of the figure called for by the Correction Officers' Benevolent Association, with which Mr. Adams has formed an alliance.[26]

69. In a status report, filed on June 30, 2022, by a court appointed monitor, the monitor stated:

> This report is the first filed by the Monitoring Team since the Action Plan was ordered by the Court on June 14, 2022 (dkt. 465), just three weeks ago.  *The jails remain dangerous and unsafe, and the conditions are volatile*.  While some progress has been made in addressing staff absenteeism and the

---

[25] www.nytimes.com/2021/12/31/nyregion/rikers-island-correction-officers.html

[26] www.nytimes.com/2022/06/10/nyregion/eric-adams-nyc-nypd-budget.html, www.nytimes.com/2021/12/31/nyregion/rikers-island-correction-officers.html

conditions at RNDC, and the Commissioner is in the process of overhauling the Department's leadership structure, and the Trials Division is processing more disciplinary cases than ever before, *the overall situation in the jails remains chaotic* and incidents involving serious harm and tragic fatalities are all too frequent. This year alone, nine incarcerated individuals have died. (p. 1) (emphasis added).[27]

70. For these reasons, United States Attorney Damian Williams is seeking a federal takeover of Rikers Island. Once again, as stated above, in July 2023, United States Attorney Damian Williams, "said in a statement the feds can no longer wait for 'substantial progress' to be made on Rikers, and his office would seek a powerful court-appointed receiver to address the horrid conditions. 'Rikers Island has been in crisis for years,' the Biden appointee said. 'This is a collective failure with deep roots, spanning multiple mayoral administrations and DOC commissioners. But after eight years of trying every tool in the toolkit, we cannot wait any longer for substantial progress to materialize.'"[28]

## **FIRST CLAIM**

### **ILLEGAL SEIZURE UNDER THE FOURTH AMENDMENT & 42 U.S.C. § 1983**

**(Against Detective William Garcia & the Unidentified Police Officer Defendants)**

71. Plaintiff repeats the foregoing allegations.

72. Defendants, acting in concert and under color of state law, seized Plaintiff in violation of the Fourth Amendment because they lacked reasonable suspicion and/or probable cause to believe that Plaintiff had committed a crime.

---

[27] www.tillidgroup.com/projects/nunez-monitorship/#reports

[28] www.nypost.com/2023/07/17/manhattan-federal-prosecutor-calls-for-federal-takeover-of-rikers

73. Defendants' conduct caused Plaintiff to suffer various personal injuries, including the injuries described herein.

74. As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

## SECOND CLAIM

### FALSE ARREST UNDER THE FOURTH AMENDMENT & 42 U.S.C. § 1983
**(Against Detective William Garcia & the Unidentified Police Officer Defendants)**

75. Plaintiffs repeat the foregoing allegations.

76. Defendants, acting in concert and under color of state law, arrested Plaintiff without probable cause in violation of the Fourth Amendment.  At no point did Plaintiff commit a crime, nor would an objectively reasonable officer conclude he had committed a crime.

77. Defendants intended to confine Plaintiff, Plaintiff was conscious of his confinement, Plaintiff did not consent to the confinement, and Plaintiff's confinement was not privileged or lawful.

78. Defendants' conduct caused Plaintiff to suffer various personal injuries, including the injuries described herein.

79. As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

## THIRD CLAIM

### MALICIOUS PROSECUTION UNDER THE FOURTH AMENDMENT & 42 U.S.C. § 1983
**(Against Detective William Garcia, District Attorney Alvin Bragg & the Unidentified Police Officer & Prosecutor Defendants)**

80. Plaintiff repeats the foregoing allegations.

30

81. Defendants, acting in concert and under color of state law, violated Plaintiff's rights under the Fourth Amendment by commencing a baseless prosecution against Plaintiff without probable cause that he had committed murder, which deprived Plaintiff of liberty, and which later terminated in Plaintiff's favor.

82. Defendants' conduct caused Plaintiff to suffer various personal injuries, including the injuries described herein.

83. As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

## FOURTH CLAIM

### VIOLATION OF EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT & 42 U.S.C. § 1983

**(Against Detective William Garcia, District Attorney Alvin Bragg & the Unidentified Police Officer & Prosecutor Defendants)**

84. Plaintiffs repeat the foregoing allegations.

85. Defendants, acting in concert and under color of state law, violated Plaintiff's right to equal protection under the Fourteenth Amendment by treating him differently on the basis of his race, selectively prosecuting him, and/or treating him differently for other pernicious motives and no legal basis.

86. Defendants' conduct caused Plaintiff to suffer various personal injuries, including the injuries described herein.

87. As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

## FIFTH CLAIM

### VIOLATION OF DUE PROCESS AND A FAIR TRIAL UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS & 42 U.S.C. § 1983

**(Against Detective William Garcia, District Attorney Alvin Bragg & the Unidentified Police Officer & Prosecutor Defendants)**

88. Plaintiff repeat the foregoing allegations.

89. Defendants, acting in concert and under color of state law, violated Plaintiff's rights to due process and a fair trial under the Fifth, Sixth and Fourteenth Amendments by conveying false information and withholding exculpatory information, including *Brady* material. in order to have Plaintiff prosecuted for murder and incarcerated.

90. Defendants' conduct caused Plaintiff to suffer various personal injuries, including the injuries described herein.

91. As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

## SIXTH CLAIM

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. 1981

**(Against Detective William Garcia, District Attorney Alvin Bragg & the Unidentified Police Officer & Prosecutor Defendants)**

92. Plaintiff repeats the foregoing allegations.

93. Defendants, acting in concert and under color of state law, violated Plaintiff's right to not to be subjected race discrimination under 42 U.S.C. 1981 by treating Plaintiff differently on the basis of his race, selectively prosecuting him, and/or treating him differently than others similarly situated.

94. Defendants' conduct caused Plaintiff to suffer various personal injuries, including the injuries described herein.

95. As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

## SEVENTH CLAIM

### 42 U.S.C. §§ 1981 & 1983 -- FAILURE TO INTERVENE

**(Detective William Garcia, District Attorney Alvin Bragg, the Unidentified Police Officer & Prosecutor Defendants & DOC Commissioner Louis Molina)**

96. Plaintiff repeats the foregoing allegations.

97. Defendants, acting in concert and under color of state law, had a reasonable opportunity to prevent the violations of Plaintiff's federal constitutional and statutory rights, but they failed to fulfill their constitutional and legal obligation to intervene.

98. Defendants' conduct caused Plaintiffs to suffer various personal injuries, including the injuries described herein.

99. As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

## EIGHTH CLAIM

### TITLE VI OF THE CIVIL RIGHTS OF 1964

**(The City of New York & District Attorney Alvin Bragg)**

100. Plaintiff  repeats the foregoing allegations.

101. Defendants are recipients of federal funds. There is no legal distinction between a District Attorney's office, a non-suable entity, and the District Attorney himself.

102. "Title VI prohibits a recipient of federal funds from intentionally treating one person worse than another similarly situated person because of his race, color, or national origin.

It does not matter if the recipient can point to 'some other . . . factor' that contributed to its decision to disfavor that individual." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141, 2209 (2023); *Id.* ("Title VI prohibits a recipient of federal funds from intentionally treating any individual worse even in part because of his race, color, or national origin and without regard to any other reason or motive the recipient might assert."); *Id.* at 2200 ("Under Title VI, it is *always* unlawful to discriminate among persons even in part because of race, color, or national origin.") (emphasis in original) (concurring opinion); *Id.* at 2217 ("Title VI prohibits a recipient of federal funds from discriminating against individuals even in part because of race.") (concurring opinion).

103. Defendants, acting in concert, violated Plaintiff's right to not to be subjected to race discrimination under Title VI by treating Plaintiff differently on the basis of his race, selectively prosecuting him, and/or treating him differently than others similarly situated.

104. Defendants' conduct caused Plaintiffs to suffer various personal injuries, including the injuries described herein.

105. As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

### NINTH CLAIM

**UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT INCLUDING LACK OF MEDICAL CARE UNDER THE FOURTEENTH AMENDMENT & 42 U.S.C. § 1983**

**(Against the City of New York & Commissioner Louis Molina & His DOC Subordinates)**

106. Plaintiff  repeats the foregoing allegations.

34

107. As stated herein, Plaintiff, a pre-trial detainee, was subjected to unconstitutional conditions of confinement and a lack of necessary medical at Rikers Island in violation of the Fourteenth Amendment.

108. Commissioner Molina, through his own observations and reports from subordinates and others, is aware of what is taking place at Rikers Island, and is personally involved, but has failed to take reasonable measures to remedy the problems.

109. The City of New York is liable under *Monell* for the conditions because the conditions are a pervasive, longstanding and widespread practice, as pled herein.

110. Defendants' conduct caused Plaintiff to suffer various personal injuries, including the injuries described herein.

111. As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

## TENTH CLAIM

### *MONELL* CLAIM AGAINST THE CITY OF YORK BASED ON THE NEW YORK COUNTY DISTRICT ATTORNEY OFFICE'S POLICIES & PRACTICES

#### (Against the City of New York)

112. Plaintiff  repeats the foregoing allegations.

113. The City of New York is liable under *Monell* for the discriminatory policies and practices of District Attorney Bragg because the policies and practices were created and maintained by Bragg, a final municipal policymaker.  The City may also liable because Bragg's policies are a pervasive practice, although a single act by a final municipal policymaker, like Bragg, confers *Monell* liability against the City.

114. Defendant's conduct caused Plaintiff to suffer various personal injuries, including the injuries described herein.

115. As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

## **ELEVENTH CLAIM**

### **ILLEGAL SEIZURE & VICARIOUS LIABILITY UNDER N.Y. COMMON LAW & N.Y.C. STATUTORY LAW**

**(Against the City of New York, Detective William Garcia & the Unidentified Police Officer Defendants)**

116. Plaintiff  repeats the foregoing allegations.

117. Defendants, acting in concert, illegally seized and confined Plaintiff and/or failed to prevent such seizure, in violation of New York common law and New York City statutory laws, N.Y.C. Admin. Code §§ 8 – 8802 – 07, because defendants lacked probable cause or reasonable suspicion to believe that Plaintiff had committed a crime.  Under N.Y.C. Admin. Code §§ 8 – 8802 – 07, there is no legal immunity available to the defendants.

118. Because the individual defendants were acting within the scope of their employment when they unlawfully seized and confined Plaintiff, the City of New York is vicariously liable to Plaintiff.

119. Defendants' conduct caused Plaintiff to suffer various personal injuries, including the injuries described herein.

120. As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

## TWELFTH CLAIM

### FALSE ARREST & IMPRISONMENT & VICARIOUS LIABILITY UNDER N.Y. COMMON LAW & N.Y.C. STATUTORY LAW

**(Against the City of New York, Detective William Garcia & the Unidentified Police Officer Defendants)**

121. Plaintiff repeats the foregoing allegations.

122. Defendants, acting in concert, falsely arrested and imprisoned Plaintiff, and/or failed to prevent such, in violation of New York common law and New York City statutory laws, N.Y.C. Admin. Code §§ 8 – 8802 – 07, because they lacked probable cause to believe that Plaintiff had committed a crime.  Under N.Y.C. Admin. Code §§ 8 – 8802 – 07, there is no legal immunity available to the defendants.

123. Because the individual defendants were acting within the scope of their employment, the City of New York is vicariously liable to Plaintiff.

124. Defendants' conduct caused Plaintiff to suffer various personal injuries, including the injuries described herein.

125. As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

## THIRTEENTH CLAIM

### ASSAULT, BATTERY & VICARIOUS LIABILITY UNDER N.Y. COMMON LAW AND N.Y.C STATUTORY LAW

**(Against the City of New York, Detective William Garcia & the Unidentified Police Officer Defendants)**

126. Plaintiff repeat the foregoing allegations.

127. Defendants, acting in concert, caused Plaintiff to apprehend an imminent and harmful or offensive physical contact, and touched and made physical contact with Plaintiff in a

37

harmful or offensive manner, without consent or legal justification, and/or failed to prevent these acts, violating Plaintiff's rights under New York common law, and New York City statutory laws, N.Y.C. Admin. Code §§ 8 – 8802 – 07.  Under N.Y.C. Admin. Code §§ 8 – 8802 – 07, there is no legal immunity available to the defendants.

128. Because the individual defendants were acting within the scope of their employment, the City of New York is vicariously liable to Plaintiff.

129. Defendants' conduct caused Plaintiff to suffer various personal injuries, including the injuries described herein.

130. As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

### FOURTEENTH CLAIM

**MALICIOUS PROSECUTION & VICARIOUS LIABILITY UNDER N.Y. COMMON LAW & N.Y.C STATUTORY LAW**

**(Against the City of New York, Detective William Garcia, District Attorney Alvin Bragg & the Unidentified Police Officer & Prosecutor Defendants)**

131. Plaintiff repeats the foregoing allegations.

132. Defendants, acting in concert and under color of state law, violated Plaintiff's rights under New York common law, and New York City statutory laws, N.Y.C. Admin. Code §§ 8 – 8802 – 07, by commencing a baseless prosecution against Plaintiff without probable cause that he had committed murder, which deprived Plaintiff of liberty, and which later terminated in Plaintiff's favor.  Under N.Y.C. Admin. Code §§ 8 – 8802 – 07, there is no legal immunity available to the defendants.

133. Because the individual defendants were acting within the scope of their employment, the City of New York is vicariously liable to Plaintiff.

134. Defendants' conduct caused Plaintiff to suffer various personal injuries, including the injuries described herein.

135. As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

**FIFTEENTH CLAIM**

**NEGLIGENCE & VICARIOUS LIABILITY FOR UNLAWFUL CONDITIONS OF CONFINEMENT INCLUDING LACK OF MEDICAL CARE AT RIKERS ISLAND**

**(Against the City of New York & Commissioner Louis Molina & His DOC Subordinates)**

136. Plaintiff repeats the foregoing allegations.

137. Having assumed physical custody of inmates, the government owes a duty of care to protect inmates from risks of harm in custody that the government was on actual or constructive notice. *Sanchez v State of New York*, 99 N.Y.2d 247, 252-255, 754 N.Y.S.2d 621, 624-26, 784 N.E.2d 675, 678-80 (Ct. of App. 2002).

138. Because the individual defendants were acting within the scope of their employment when they breached their duty of care to Plaintiff by subjecting him to unconstitutional conditions of confinement, including a lack of medical care, the City of New York is vicariously liable to Plaintiff.

139. Defendants' conduct caused Plaintiff to suffer various personal injuries, including the injuries described herein.

140. As a result of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial.

WHEREFORE, Plaintiff requests the following relief jointly and severally against the defendants:

     a.       Compensatory damages in an amount to be determined by a jury;

     b.       Punitive damages in an amount to be determined by a jury;

     c.       Attorney's fees and costs;

     d.       Such other and further relief as the Court may deem just and proper.

DATED: September 29, 2023

*/s/ Richard Cardinale*

_____
RICHARD CARDINALE
Attorney at Law
26 Court Street, Suite # 1507
Brooklyn, New York 11242
(718) 624-9391
richcardinale@gmail.com