```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __8/26/2024__
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSE ALBA,

      Plaintiff,

           -against-

CITY OF NEW YORK, et al.,

      Defendants.

23-CV-8619 (LAK) (BCM)

**REPORT AND RECOMMENDATION
TO THE HON. LEWIS A. KAPLAN**

**BARBARA MOSES, United States Magistrate Judge.**

On July 1, 2022, shortly after 11:00 p.m., plaintiff Jose Alba stabbed Austin Simon repeatedly, killing him almost instantly, behind the counter of the Manhattan convenience store where Alba worked as a clerk. The killing was captured on video by the store's security cameras. Alba was arrested that night, charged by complaint with murder in the second degree, in violation of New York Penal Law (PL) § 125.25(1), and detained for five days at Rikers Island before the People moved to lower his bail, whereupon he was released. On July 19, 2022, the case was dismissed – pre-indictment – after prosecutors advised the New York County Criminal Court that they could not "prove beyond a reasonable doubt that [Alba] was not justified in his use of deadly physical force."

In this action, plaintiff seeks damages under federal law for unlawful seizure, false arrest, malicious prosecution, selective prosecution based on race, violation of his right to a fair trial, race discrimination, failure to intervene, and unconstitutional conditions of confinement at Rikers Island, and under state law for illegal seizure, false arrest and imprisonment, assault and battery, malicious prosecution, and negligence. He has sued three groups of defendants: (1) the City of New York (City), together with seven named New York Police Department (NYPD) detectives and officers and an unknown number of (as yet unidentified) "Doe" police officers (together, the City Defendants); (2) former New York City Department of Correction (DOC) Commissioner

Louis Molina, together with an unknown number of (as yet unidentified) "Doe" DOC employees; and (3) New York County District Attorney Alvin Bragg (DA Bragg), together with an unknown number of (as yet unidentified) "Doe" prosecutors, lawyers, advisors, and policymakers employed by the District Attorney of New York County (DANY). Plaintiff's theory, in a nutshell, is that even though the store videos "conclusively demonstrated" that he acted in self-defense, Am. Compl. (Dkt. 41) ¶ 6, and were "available to the detectives, police officers and DA Bragg's office when plaintiff was arrested and before [he] was charged and arraigned," *id.*, Alba was nonetheless arrested by the NYPD, prosecuted by the DANY, and detained at Rikers Island "because he is not Black," in furtherance of DA Bragg's "policy to achieve 'racial equity' in the Manhattan criminal justice system." *Id.* ¶¶ 1, 2, 58.

Now before me for report and recommendation (*see* Dkt. 7) are two motions to dismiss plaintiff's claims pursuant to Fed. R. Civ. P. 12(b)(6), one filed by the named City Defendants and Commissioner Molina (Dkt. 50),[1] and one by DA Bragg (Dkt. 54). Also before me is plaintiff's cross-motion for leave to file a second amended complaint. (Dkt. 64.) For the reasons that follow, I recommend, respectfully, that defendants' motions be granted. All of plaintiff's federal claims (to the extent he has not voluntarily withdrawn them, *see* Part I(B), *infra*, should be dismissed with prejudice, along with their state law counterparts. Any remaining state law claims should be dismissed without prejudice. Plaintiff's cross-motion for leave to amend should be denied, except that he should be granted leave to replead his federal and state claims arising out of the conditions of confinement during his detention at Rikers Island.

---

[1] In the alternative, the City Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56. As discussed in Part II(A)(2), *infra*, I do not reach the alternative motion.

## I.    BACKGROUND

### A.    Facts

The following account relies on the well-pleaded factual allegations set forth in the Amended Complaint, together with documents incorporated therein by reference or "integral to the complaint," including the store surveillance videos that, according to plaintiff, "conclusively demonstrate[]" the lack of probable cause to arrest or charge him. *See Norales v. Acevedo*, 2022 WL 17958450, at *1 (2d Cir. Dec. 27, 2022) (summary order) (surveillance video was properly relied on by district court in granting Rule 12(b)(6) motion where plaintiff alleged that the video undermined probable cause for his arrest and prosecution). Additionally, I have taken judicial notice of the contents of plaintiff's Criminal Court file and related public records. For purposes of the pending motions to dismiss, I accept as true the facts set forth in the Amended Complaint "to the extent that they are not contradicted by the video evidence," *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017) (quoting *Garcia v. Does*, 779 F.3d 84, 88 (2d Cir. 2015)), or by other materials properly considered by the Court, and have drawn all reasonable inferences from those facts in plaintiff's favor.

### 1.    The Parties and Relevant Non-Parties

Plaintiff, who is Hispanic and "not Black," Am. Compl. ¶¶ 1, 2, 51, is 5 feet 6 inches tall and was 61 years old on July 1, 2022. *Id.* ¶ 41. Simon, who was "Black or African-American," was 35 years old and "over 6 feet tall." *Id.* ¶¶ 2, 41. Simon's girlfriend Tina Lee, also known as Erica Grady (Grady) is also "Black or African-American." *Id.* ¶¶ 2, 6. DA Bragg, who is Manhattan's first Black District Attorney, was sworn into office on January 1, 2022. *Id.* ¶ 21.

Plaintiff provides no demographic information concerning the seven NYPD detectives and officers he has named individually. They are: Detective Carlos Pagan, who responded to the scene of the stabbing, where plaintiff was arrested, and later questioned Alba at the 30th Precinct, *see*

Am. Compl. ¶¶ 19, 45; Detective William Garcia, who responded to the scene of the stabbing, sat in on plaintiff's interrogation, and signed the Criminal Court complaint charging plaintiff with second-degree murder, *see id.* ¶¶ 19, 45, 47, 49; and five additional NYPD officers – Officer Anthony Lall, Officer Malvin Rodriguez, Lieutenant Chandradeo Etwaroo, Sergeant Ruppert Mark, and Sergeant Olga Peralta – who responded to the scene, but whose conduct is not otherwise described in the Amended Complaint. *Id.* ¶ 45.

### 2.    DA Bragg's Public Statements and Policies

Relying primarily on news articles and editorials – hyperlinked in the footnotes to the Amended Complaint – plaintiff alleges that during his campaign for District Attorney, and again on the day he was sworn in, DA Bragg stated that one of his goals was to end "racial disparities" in the criminal justice system. Am. Compl. ¶¶ 22-24. In one campaign speech, Bragg stated that historically, "being a rich, old White man . . . allowed you to evade accountability," resulting in "two standards of justice." *Id.* ¶ 21.[2] On his campaign website, Bragg stated that he would not prosecute "most petty offenses through the traditional criminal court system," in part because "[t]he punishments are disproportionately harsh, and fall disproportionately on the backs of people of color." *Id.* ¶ 25. In plaintiff's view, these statements show that DA Bragg is committed to "equality of outcome," *id.* ¶¶ 23, 26,[3] and permit the inference that the DANY's policies and

---

[2] The Fox News article hyperlinked by plaintiff for this point makes it clear that the "rich," "old," "White" men to whom Bragg referred were Jeffrey Epstein and Harvey Weinstein. *See* Am. Compl. ¶ 21 n.9; foxnews.com/politics/alvin-bragg-invoked-race-comparing-trump-epstein-weinstein-rich-old-white-man. (All websites last visited August 26, 2024.)

[3] Plaintiff does not allege that DA Bragg or his office ever articulated "equality of outcome" as a goal. To the contrary: in DA Bragg's inauguration speech – hyperlinked in the Amended Complaint – he pledged not only to end "racial disparities" but to "deliver one standard of justice for all." *See* Am. Compl. ¶ 23 n.12; https://manhattanda.org/alvin-bragg-sworn-in-as-district-attorney-of-new-york-county/. However, plaintiff explains, "[r]acial equity" (a phrase Bragg allegedly did use) "is often defined as equality of outcome," which a district attorney "cannot legally obtain" without

practices "provide preferential treatment to criminal defendants who are Black or African-American over other races and ethnicities," and "result in criminal defendants who are not Black to be [sic] treated more harshly, especially when the alleged victims are Black." *Id.* ¶ 2.

Plaintiff does not further describe the DANY's discriminatory policies and practices. Nor does he provide any statistical support for his allegations concerning preferential prosecutorial treatment for Black criminal defendants, or harsh treatment for criminal defendants who are not Black or whose victims are Black. Instead, he describes two recent cases, discussed *infra* at n.30, in which non-Black defendants were, in plaintiff's view, overcharged by the DANY. *See* Am. Compl. ¶¶ 27-38. Plaintiff does not allege that the NYPD (as opposed to the DANY) has implemented any policies or procedures that provide preferential treatment to Black defendants.

On election night 2021, DA-elect Bragg stated that "getting people out of jail was another urgent priority" in light of the "humanitarian crisis" at Rikers Island, which is a City-run detention facility known for its "horrid conditions." Am. Compl. ¶¶ 22, 56.

### 3.    The July 1, 2022 Stabbing

On Friday, July 1, 2022, plaintiff was working an evening shift at the Blue Moon convenience store. Am. Compl. ¶ 39. At 10:55 p.m., the store surveillance video shows Grady and her young daughter entering the store. *See* Declaration of Brian Francolla (Francolla Decl.) (Dkt. 53) Exs. A, A-1 through A-10 (collectively, the Store Videos).[4] Plaintiff was behind the counter,

---

"impermissibly considering race." Am. Compl. ¶¶ 23, 26 (citing *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023)).

[4] Exhibit A to the Francolla Declaration is a compilation of the relevant surveillance footage from 10:55 p.m. to 11:06 p.m., showing the key events during that period, including the stabbing, from three different vantage points. Exhibits A-1 through A-10 each show only one view, but some of them (for example, Exhibit A-2, showing a view of the sidewalk outside the Blue Moon, and Exhibits A-1 and A-9, showing views from behind the counter) include extended footage, capturing the NYPD response. Additionally, Exhibit A-1 includes intermittent audio. All of the Store Videos are consistently time-stamped.

in a small space accessible through a narrow doorway to his left, which stood open. Store Videos (Ex. A-1). Grady attempted to purchase chips for her daughter using an electronic payment card, which was declined. Am. Compl. ¶ 40; Store Videos (Exs. A, A-1, A-3, A-5, A-9). At 11:00:30, plaintiff pulled the bag of chips from the girl's hand, angering Grady, who knocked several items off the counter, cursed at plaintiff, and left the store, shouting, "my n****'s gonna come down here right now and f*** you up." Am. Compl. ¶ 40; Store Videos (Exs. A, A-1, A-3, A-5).

Simon entered the store at 11:05:10 p.m., trailed by Grady and her daughter. Am. Compl. ¶¶ 40-41; Store Videos (Exs. A, A-1, A-2, A-5). Within seconds, Simon entered the cramped space behind the counter and confronted plaintiff, asking "in a threatening tone what he had done to [Grady's] child." Am. Compl. ¶ 42; Store Videos (Exs. A, A-1, A-4, A-9). Simon carried no visible weapons, but he "pushed plaintiff on his chest[,] causing Plaintiff to fall onto a chair." Am. Compl. ¶ 42; Store Videos (Exs. A, A-1, A-9). Plaintiff offered no resistance, and remained in the chair for approximately 15 seconds, while Simon stood in front of him, shifting from foot to foot and blocking plaintiff's exit. Store Videos (Exs. A, A-1, A-9). Simon then grabbed the left side of plaintiff's shirt collar, pulled him up from the chair, and pushed him towards the doorway. Am. Compl. ¶ 42; Store Videos (Exs. A, A-9). At 11:05:46, while still behind the counter, plaintiff reached down with his right hand, grabbed a knife from a shelf, and thrust it at Simon, stabbing him repeatedly in the neck, chest, and abdomen – in the process sustaining small wounds to his own left arm. Store Videos (Exs. A, A-4, A-9). While the two men were struggling, Grady approached the doorway and, at 11:05:53, reached through it to grab plaintiff's right arm. Store Videos (Exs. A, A-4). When that proved ineffective, she backed away, took a knife from her purse at 11:06:03, and swung it twice at plaintiff, cutting his right arm and hand. *Id*. By then, however,

Simon was collapsing to the floor, where he remained, face-down, in a rapidly spreading pool of his own blood. Store Videos (Exs. A, A-4).[5]

The entire incident – from the moment Simon walked through the door of the Blue Moon to the moment he fell to the floor, mortally wounded – lasted approximately one minute.

### 4.    Arrest and Interrogation

Plaintiff "told a customer to call the police," and "[s]everal NYPD officers arrived minutes later," Am. Compl. ¶¶ 44-45, including all of the NYPD officers named in the Amended Complaint. *Id.* ¶ 45. When the first officer entered the Blue Moon, at 11:09:51 p.m., plaintiff was still behind the counter (speaking on his cellphone), with blood on his hands and arms and the bloody knife at his feet. *See* Store Videos (Exs. A-5, A-9).

Plaintiff alleges that the officers did not "speak to [him] about what happened," and likewise "did not speak to any witnesses or customers in the store to determine what had occurred," Am. Compl. ¶ 45, but "simply arrested him," without probable cause. *Id.* The video footage, however, shows that when the police arrived, Grady (who was crouched next to Simon's body) pointed to plaintiff, identified him as the perpetrator, and stated that the fight was over "three f***ing dollars, that he snatched from my daughter." Store Videos (Exs. A, A-1, A-4). At 11:11,

---

[5] As the City Defendants point out, *see* City Mem. (Dkt. 51) at 12-13, plaintiff's description of the stabbing varies from the Store Videos in three significant ways. First, plaintiff alleges that before he grabbed his own knife, he "observed that [Grady] had obtained a long knife and concluded that Simon and [Grady], both of whom were screaming at Plaintiff, were going to kill him." Am. Compl. ¶ 43. This is inaccurate. Grady did not remove her knife from her purse until after Alba inflicted the fatal wounds on Simon. Second, plaintiff alleges that he grabbed his knife "to protect himself as Simon was hitting him." *Id.* This is also inaccurate. Simon shoved plaintiff once, at 11:05:29. At 11:05:46, when Alba reached for the knife, Simon was holding the shoulder of his shirt and pushing him out of the counter area. Third, plaintiff alleges that both Simon and Grady "cut plaintiff several times with the knife" before plaintiff "used his knife on Simon to protect himself." *Id.* ¶¶ 43-44. This is also inaccurate. Plaintiff was clearly the first person to use a weapon. As noted above, Simon was mortally wounded before Grady got her own knife out of her purse.

a police officer asked plaintiff, "What happened?" and then, "Did you stab him?" *Id*. (Exs. A, A-1). Plaintiff's response is difficult to hear, but he can be seen on the video speaking with the police officer while gesticulating towards Simon's body. *Id*. At 11:12, and again at 11:14, officers spoke to Grady on the sidewalk outside of the store. Store Videos (Ex. A-2). They also spoke to the customer who was standing at the counter when the altercation began. *Id*.

Plaintiff was handcuffed and, despite his "visible stab wounds," taken to the 30th Precinct "rather than to the hospital." Am. Compl. ¶ 46. Both plaintiff and Grady waived their *Miranda* rights at the precinct and were questioned (separately) by Detective Pagan, accompanied by Detective Garcia. *Id*. ¶¶ 46, 47. Grady's interrogation began at 1:34 a.m. on July 2, 2022. Initially, she stated that once Simon went behind the counter and the two men got "into a tussle," she "couldn't see anything else." Francolla Decl. Ex. I (Grady Int. Video) at 1:38. After Detective Pagan advised her to "be truthful," because "we have video now," *id*. at 1:38-39 (and showed her some video footage on a phone), Grady acknowledged that she tried to stab plaintiff with the knife she took from her purse, but stated that she "couldn't, so I put it back." *Id*. at 1:44. Grady pointed out that at least some of Alba's wounds were visible on the video before she injected herself into the struggle. *Id*.

Plaintiff's interrogation, conducted in Spanish, began at 5:56 a.m. on July 2, 2022. *See* Francolla Decl. Ex. G (Alba Int. Video); Francolla Decl. H (Alba Int. Transcript) at 8.[6] Plaintiff stated that after Simon shoved him into the chair, he "grabbed me to take me to her, to make me say, 'I'm sorry,'" which is when plaintiff "grabbed that knife." Alba Int. Video at 6:01; Alba Int.

---

[6] Plaintiff alleges that he was interrogated at the precinct "before being taken for medical care." Am. Compl. ¶¶ 47-48. This is also inaccurate. Not only was his interrogation delayed until almost 6:00 a.m.; the video clearly shows plaintiff wearing a hospital bracelet on his wrist, with bandages visible on his left arm and his right hand.

Tr. at 8. With regard to his own injuries, plaintiff explained that Simon cut his left arm with the tip

of the knife as they were struggling, and then Grady "took something out of her purse" and cut him

on his right arm and hand. Alba Int. Video at 6:01 (gesturing); Alba Int. Tr. at 8. Plaintiff confirmed

that Simon had no visible weapon, Alba Int. Video at 6:01-02; Alba Int. Tr. at 9,[7] and that he

"didn't actually hit me, we were just grappling[.]" Alba Int. Video at 6:02; Alba Int. Tr. *id*. at 9.

However, plaintiff stated, "he was putting pressure on me and yelling loudly." Alba Int. Video at

6:02; Alba Int. Tr. at 9. Upon learning from Detective Garcia that Simon was dead, plaintiff stated,

"I don't know how that happened, honestly, I didn't want to do that." Alba Int. Video at 6:02; Alba

Int. Tr. at 10.

### 5.    Murder Charge

On Saturday, July 2, 2022, "[p]laintiff was charged with murder in the second degree in a

Criminal Complaint signed by Detective Garcia[.]" Am. Compl. ¶ 49; *see also* Francolla Decl. Ex.

N (Crim. Compl.). Plaintiff alleges that Garcia and unspecified "other detectives," after "[w]orking

with DA Bragg and [unspecified] high-level officials in DANY," "misrepresented the video of the

incident to put forward a false narrative so Plaintiff could be charged with murder, and further

Bragg's goal of racial equity." *Id.* Plaintiff quotes the following portion of the Criminal Complaint:

> I reviewed surveillance video from the store depicting the following:
>
> At approximately 11:05 PM, Mr. Simon entered the area behind the counter. Mr.
> Simon was carrying a small white towel in his left hand and his right hand was
> empty. Mr. Simon pushed the defendant once and spoke to him while the defendant
> sat in a chair behind the counter. Mr. Simon then put the towel in his pocket and
> attempted to steer the defendant out of the area behind the counter, but the
> defendant picked up a kitchen knife that was stashed behind the counter and stabbed
> Mr. Simon in the neck and chest at least five times. Informant [Tina Lee] attempted
> to pull the defendant away from Mr. Simon and held the defendant's right arm but
> the defendant continued to stab Mr. Simon. Informant then took a knife from her

---

[7] There was a box cutter in Simon's pocket. *See* Am. Compl. ¶ 64. However, he never used it, or
brandished it, and plaintiff does not allege that he ever saw it.

> purse and stabbed the defendant's arm. Mr. Simon fell to the ground, face-down and bleeding.

Am. Compl. ¶ 49 (alteration in original); Crim. Compl. at 1. Plaintiff does not point to any specific factually false statement in the Criminal Complaint. Rather, he alleges broadly that the charging instrument "made Plaintiff appear culpable for a crime he did not commit, and minimized Simon's conduct so that Simon could be characterized as the victim." Am. Compl. ¶ 50.

On the day he was sworn into office, DA Bragg issued a written policy stating that "ADAs shall presumptively indict both top counts and lesser included counts when presenting cases to the grand jury, permitting a wider range of statutorily permissible plea bargaining options." Am. Compl. ¶ 51 & n.25 (citing and hyperlinking DA Bragg's January 2,2022 "Day One Memo," *available at* http://www.manhattanda.org/wp-content/uploads/2022/01/Day-One-Letter-Policies-1.03.2022.pdf). The Criminal Complaint did not charge plaintiff with any lesser included offenses, such as manslaughter. *Id*. ¶ 50. This, according to plaintiff, "would have resulted in substantially lower bail," *id*., but was not done "because Alba is not Black." *Id*. ¶¶ 51, 58.[8] Further, plaintiff alleges, "[b]ecause of the races of Alba and Simon, DANY did not follow Bragg's policy of deferring prosecution when further investigation was warranted." *Id*. ¶ 59.[9]

---

[8] Plaintiff does not explain why the policy he describes would apply where, as here, his case was never presented to a grand jury. I note as well that plaintiff appears to misunderstand the role of a lesser included offense in a felony prosecution. The lesser included offense is charged in addition to – not instead of – the "top charge" (here, murder in the second degree). The addition of a lesser included offense is thus unlikely to result in "substantially lower bail." Am. Compl. ¶ 50. The purpose of charging lesser included offenses in the indictment is to "permit[] a wider range of statutorily permissible plea bargaining options." Day One Memo at 5.

[9] The relevant provision of the Day One Memo says something a bit different: that prosecution may be deferred "if the discovery available at the time of arraignment is so sparse, or so potentially voluminous, that the ADA believes it poses a significant risk that the Office will not meet its discovery requirements in arraigning the case immediately, provided that doing so poses no public safety risk." Am. Compl. ¶ 59 (quoting Day One Memo at 3). Plaintiff does not allege that the discovery available at the time of his arraignment was either "so sparse, or so potentially voluminous" that the DANY could be unable to meet its discovery requirements.

At plaintiff's arraignment, the People asked that he "be held on $500,000 bail [sic] or bond," despite his lack of a criminal record and his strong community ties. Am. Compl. ¶ 52. Plaintiff alleges that this was due to "the misrepresentations and withholding of exculpatory information by the detectives and officers, . . . coupled with DA Bragg and DANY's discriminatory policies and practices[.]" *Id*. A Criminal Court judge set bail at $250,000 cash or $500,000 bond. *Id*.

### 6.    Rikers Island

Unable to post bail, plaintiff was remanded to the Rikers Island correctional facility, where he was "held under inhumane and unconstitutional conditions, particularly in the intake area, and was not provided with protection from contracting Covid-19 and other infectious diseases." Am. Compl. ¶ 53. DA Bragg "was aware of the horrid conditions at Rikers Island[.]" *Id*. ¶ 55. However, plaintiff alleges, "[b]ecause of the race of Simon and [Grady], and because Alba is not Black," DA Bragg "knowingly allowed Plaintiff to suffer at Rikers Island" while his office continued to investigate the case. *Id*. ¶ 58.

While at Rikers Island, plaintiff "was in an intake cell for approximately two days." Am. Compl. ¶ 53. To illustrate the condition of the intake cell, plaintiff includes a photograph from a 2021 *New York Post* article (showing an overcrowded cell with men sleeping in rows on the floor). *Id*. ¶ 54. Plaintiff explains that he was held under the same conditions, "except his cell was less crowded, but still overcrowded." *Id*. At a Rikers Island medical clinic, "it was determined that [his] stab wounds had to be cleaned twice daily and that he needed medication to prevent or cure an infection and alleviate pain." *Id*. ¶ 60. However, despite requests, the Rikers Island staff "did not ensure that Plaintiff received the recommended treatment and medication" for his wounds, and only took him for follow-up care "one time during his entire incarceration." *Id*.

That incarceration lasted five days, until July 7, 2022, when "a lower bail package was arranged due to the public outrage against DA Bragg," and plaintiff was released. Am. Compl.

¶ 61.[10] By then, various public figures, including the Mayor of New York City, had seen portions of the Store Videos and made statements in support of plaintiff. *Id*. ¶¶ 61-62. During this period, DA Bragg stated that "he had not 'committed' to prosecuting Alba and [that] 'We are continuing to review the evidence and the investigation is ongoing.'" *Id*. at 24 (second ¶ 56).

### 7.    Motion to Dismiss the Criminal Case

On July 19, 2022, the DANY filed a motion to dismiss the criminal case against plaintiff, Am. Compl. ¶ 63, on the ground that "the People have determined that we cannot prove beyond a reasonable doubt that the defendant was not justified in his use of deadly physical force." Francolla Decl. Ex. R (Mot. to Dismiss) at ECF p. 2. Plaintiff alleges that the motion was filed in response to "the national outrage that resulted from the arrest and prosecution of an innocent man protecting himself during a crime wave." Am. Compl. ¶ 63.

The motion was supported by the affirmation of an Assistant District Attorney (ADA), who described the crucial events as follows:

> Minutes after the girlfriend left angrily, Simon came to the store, entered the small, employees-only area behind the counter, shoved Alba against a wall of shelving, and grabbed him by the collar to lift him out of a chair and force him out of the employees-only area, saying that he wanted Alba to apologize to the girl. With Simon holding him by the collar and forcibly pushing him out, Alba grabbed a knife from a shelf beside the counter and repeatedly stabbed Simon as they struggled.

Mot. to Dismiss at ECF p. 4. The affirmation stated that the DANY conducted an extensive investigation after Alba's arrest, including interviews of witnesses to the stabbing, police officers, medical technicians, and the medical examiner, and examination of "extensive video evidence," including portions of the Store Videos not made public. *Id*. at ECF p. 5. As a result, according to the ADA, "the District Attorney's Office has concluded that a homicide case against Alba could

---

[10] On July 7, 2022, on the People's application, plaintiff's bail was reduced to $50,000 cash or bond. *See* Francolla Decl. Ex. Q (transcript of July 7, 2022 Criminal Court proceeding), at 4-10.

not be proven at trial beyond a reasonable doubt. Consequently, the People will not be presenting the case to the grand jury[.]" *Id*. Specifically, the ADA explained, the People concluded that they could not carry their burden of disproving Alba's anticipated "justification" defense under PL §§ 35.15 or 35.20(3). *Id*.

 Plaintiff does not dispute any of the factual statements made in the Motion to Dismiss. To the contrary, he endorses them, *see* Am. Compl. ¶ 64, but alleges that all of the facts relied on in the motion "were available to defendants when Plaintiff was arrested, and before Plaintiff was charged with murder and arraigned, [and] should have precluded an arrest and prosecution for murder or any other crime." *Id*. ¶ 65.

The Criminal Court granted the motion, Am. Compl. ¶ 66, ending plaintiff's prosecution. *See* Declaration of Corey S. Shoock (Shoock Decl.) (Dkt. 55) Ex. C (Certificate of Disposition as to *People v. Alba*). Grady was not prosecuted for her role in the altercation. Am. Compl. ¶ 66.

### B.    Procedural History

Plaintiff commenced this action on September 29, 2023, against the City, Detective Garcia, DA Bragg, the DOC, former Commissioner Molina, and "John and Jane Does 1-20." (Dkt. 1.) On October 19, 2023, the Court unsealed the records relating to plaintiff's arrest and prosecution for use in this action. (Dkt. 17.) On December 22, 2023, the City, Detective Garcia, and Commissioner Molina moved to dismiss plaintiff's claims against them pursuant to Rule 12(b)(6) or, in the alternative, for summary judgment. (Dkt. 20.) On December 26, 2023, DA Bragg moved to dismiss plaintiff's claims against him pursuant to Rule 12(b)(6). (Dkt. 24.)

Exercising his right to amend "once as a matter of course" under Fed. R. Civ. P. 15(a)(1)(B), plaintiff filed his Amended Complaint on January 11, 2024, thereby mooting

defendants' motions.[11] In the Amended Complaint, plaintiff identifies six additional individual defendants – Pagan, Lall, Rodriguez, Etwaroo, Mark, and Peralta – and expands his description of the "Doe" defendants to include "unidentified DANY prosecutors and lawyers and non-lawyers who are not prosecutors, but advisors and policymakers." Am. Compl. ¶ 7.

Invoking this Court's federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367, Am. Compl. ¶ 11-12, plaintiff asserts 15 causes of action:

- Claim 1, seeking damages for illegal seizure in violation of the Fourth and Fourteenth Amendments, U.S. Const. amend. IV, XIV, is brought pursuant to 42 U.S.C. § 1983 against "the Detective and Police Officer Defendants," alleging that they seized plaintiff without "reasonable suspicion and/or probable cause to believe that Plaintiff had committed a crime." Am. Compl. ¶¶ 77-80.

- Claim 2, seeking damages for false arrest in violation of the Fourth and Fourteenth Amendments, is brought pursuant to § 1983 against the Detective and Police Officer Defendants, alleging that they arrested plaintiff without probable cause. *Id.* ¶¶ 81-85.

- Claim 3, seeking damages for malicious prosecution in violation of the Fourth and Fourteenth Amendments, is brought pursuant to § 1983 against the Detective, Police Officer, and "District Attorney Defendants," for "commencing a baseless prosecution against Plaintiff without probable cause that he had committed murder," which prosecution later terminated in plaintiff's favor. *Id.* ¶¶ 86-69.

- Claim 4, seeking damages for "violation of equal protection under the Fourteenth Amendment," U.S. Const. amend. XIV, § 1, is brought pursuant to § 1983 against the Detective, Police Officer, and District Attorney Defendants, for "selectively prosecuting him because of his race, and/or treating him differently for other pernicious motives without any legal basis." *Id.* ¶¶ 90-93.

- Claim 5, seeking damages for "violation of due process and a fair trial" under the Fifth, Sixth, and Fourteenth Amendments, U.S. Const. amend. V, VI, and XIV, § 1, is brought pursuant to § 1983 against the Detective, Police Officer, and District Attorney Defendants, for "conveying false information and withholding exculpatory information, including *Brady* material, in order to have Plaintiff prosecuted for murder and incarcerated." *Id.* ¶¶ 94-97.

---

[11] The Clerk's Office rejected plaintiff's first four attempts to file his amended pleading, due to technical errors (*see* Dkts. 32, 35, 37, 39), but ultimately accepted the Amended Complaint on January 18, 2024.

- Claim 6, seeking damages for "race discrimination in violation of 42 U.S.C. § 1981," is brought against the Detective and District Attorney Defendants, for "treating Plaintiff differently because he is not Black." *Id.* ¶¶ 98-101.

- Claim 7, seeking damages for "failure to intervene," is brought pursuant to 42 U.S.C. §§ 1981 and 1983 against all of the individual defendants, because they "had a reasonable opportunity to prevent the violations of Plaintiff's federal constitutional and statutory rights, but they failed to fulfill their constitutional and legal obligation to intervene." *Id.* ¶¶ 102-105.

- Claim 8, seeking damages under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d , is brought against the City and DA Bragg, as "recipients of federal funds," for "treating Plaintiff differently because he is not Black." *Id.* ¶¶ 106-111.

- Claim 9, seeking damages under *Monell v. Dept of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), is brought pursuant to § 1983 against the City and Commissioner Molina, alleging that they subjected him to "unconstitutional conditions of confinement" at Rikers Island. *Id.* 112-117.

- Claim 10, also seeking damages under *Monell*, is brought pursuant to § 1983 against the City, because the "the discriminatory policies and practices of DA Bragg and his office . . . were created and maintained by Bragg, a final municipal policymaker." *Id.* ¶¶ 118-121.

- Claim 11, seeking damages for "illegal seizure & vicarious liability," is brought pursuant to New York common law and N.Y.C. Admin. Code §§ 8-8802-07 [sic] against the City and the Detective and Police Officer Defendants, because they "illegally seized and confined Plaintiff" without probable cause or reasonable suspicion, "and/or failed to prevent such seizure." *Id.* ¶¶ 122-126.

- Claim 12, seeking damages for "false arrest and imprisonment & vicarious liability," is brought pursuant to New York common law and §§ 8-8802-07 [sic] against the City and the Detective and Police Officer Defendants, alleging that they "falsely arrested and imprisoned Plaintiff" without probable cause or reasonable suspicion "and/or failed to prevent such." *Id.* ¶¶ 127-131.

- Claim 13, seeking damages for "assault, battery, & vicarious liability," is brought pursuant to New York common law and §§ 8-8802-07 [sic] against the City and the Detective and Police Officer Defendants, because they "caused Plaintiff to apprehend an imminent and harmful or offensive physical contact, and touched and made physical contact with Plaintiff in a harmful or offensive manner, without consent or legal justification, and/or failed to prevent these acts." *Id.* ¶¶ 132-135.

- Claim 14, seeking damages for "malicious prosecution & vicarious liability," is brought pursuant to New York common law and §§ 8-8802-07 [sic] against the City and the Detective, Police Officer, and District Attorney Defendants, for "commencing a baseless prosecution against Plaintiff without probable cause that

he had committed murder," and which later terminated in his favor. *Id.* ¶¶ 136-140.[12]

- Claim 15, seeking damages for "negligence & vicarious liability," is apparently brought pursuant to New York common law against the City, Commissioner Molina, "and his unidentified DOC subordinates," for "unlawful conditions of confinement including lack of medical care at Rikers Island." *Id.* ¶¶ 141-145.

On February 8, 2024, the City Defendants and former Commissioner Molina filed their joint motion, supported by their memorandum of law, a Statement of Undisputed Material Facts pursuant to Local Civil Rule 56.1 (City SMF) (Dkt. 52), and the Francolla Declaration, which attaches 18 exhibits, including the Store Videos; the interrogation videos; NYPD body-worn camera (BWC) footage from the night of the stabbing; plaintiff's arrest report; the Criminal Complaint, Motion to Dismiss, and other filings from plaintiff's criminal case; and an assortment of documents reflecting the NYPD's investigation of the killing. *See* Francolla Decl. Exs. A-Q. The City Defendants and Molina ask the Court to dismiss all of plaintiff's claims against them pursuant to Rule 12(b)(6) or, in the alternative, Rule 56. *See* City Mem. at 6-9.

Also on February 8, 2024, DA Bragg filed his motion to dismiss, made pursuant to Rule 12(b)(6), supported by a memorandum of law (Bragg Mem.) (Dkt. 56) and the Shoock Declaration, attaching three exhibits, all from plaintiff's criminal case: the Criminal Complaint, the Motion to Dismiss, and the Certificate of Disposition. Shoock Decl. Exs. A-C.

On March 8, 2024, plaintiff filed his cross-motion for leave to further amend, along with his combined memorandum (Pl. Mem.) (Dkt. 63) in opposition to defendants' motions and in

---

[12] In Claims 11-14, plaintiff likely intended to cite N.Y.C. Admin. Code §§ 8-802 through 8-807. Section 8-802 states that natural persons have the right to be "secure in their persons, houses, papers and effects against unreasonable searches and seizures, and to be secure against the use of excessive force, and that "no warrants shall be issued but upon probable cause[.]" Section 8-803(a) permits civil actions against any "covered individual" who violates the rights guaranteed by § 8-802 under color of law.

support of his cross-motion. In that memorandum, plaintiff withdrew his Equal Protection claim (Claim 4), to the extent it is based on a selective prosecution or "class of one" theory; his § 1981 claim (Claim 6), and his *Monell* claim (Claim 9) based on the conditions at Rikers Island. *See* Pl. Mem. at 37, 39, 48. Plaintiff did not file any response to the City Defendants' Local Civil Rule 56.1 statement. Nor did he file a proposed second amended complaint for the Court's review.

On March 22, 2024, defendants filed their reply papers, *see* Bragg Reply (Dkt. 68); City Reply (Dkt. 69), and on March 23, 2024, plaintiff filed a reply brief (Pl. Reply) (Dkt. 70) in further support of his cross-motion for leave to amend. By letter dated August 16, 2024 (Dkt. 72), plaintiff offered to file "a proposed pleading in 30 days." Plaintiff explained that he made the offer in light of Local Civil Rule 15.1(a), which – as of July 1, 2024 – requires that motions for leave to amend be accompanied by "a clean copy" of the proposed amended pleading, as well as a copy showing "all differences" from the current pleading.[13]

## II.    ANALYSIS

### A.    Legal Standards

#### 1.    Rules 8(a)(2), 12(b)(6), and 12(d)

Fed. R. Civ. P. 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." If that "short and plain statement" fails to present "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," the deficient claims may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). *Absolute Activist*

---

[13] Even before the recent updates to the Local Civil Rules, courts in this district routinely declined to consider motions for leave to amend unless accompanied by "a proposed amended complaint" and a redline. *Nat'l Debt Relief, LLC v. Season 4, LLC*, 2024 WL 3105706, at *1 (S.D.N.Y. June 24, 2024) (Kaplan, J.); *see also*, *e.g.*, *Paul Rudolph Found. v. Paul Rudolph Heritage Found.*, 2022 WL 4109723, at *12 (S.D.N.Y. Sept. 8, 2022) ("[A] complete copy of the proposed amended complaint must accompany a request for leave to amend so that both the Court and opposing parties can understand the exact changes sought.") (internal quotation marks omitted).

*Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

When faced with a Rule 12(b)(6) motion, the trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, those factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[A] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (internal citations omitted) (quoting *Twombly*, 550 U.S. at 555, 557). Thus, the courts will not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79.

### 2.    Materials That May Be Considered

"The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). However, the court is not limited to the facts alleged in the body of the complaint. Under Rule 10(c), "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Additionally, the Second Circuit has repeatedly authorized the district courts to consider "materials incorporated in [the complaint] by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *L-7 Designs, Inc. v.*

*Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)).

A document is "deemed incorporated by reference into the complaint" where the complaint "explicitly refers to and relies upon" it. *Sira*, 380 F.3d at 67; *see also Dunkelberger v. Dunkelberger*, 2015 WL 5730605, at *5 (S.D.N.Y. Sept. 30, 2015) ("[t]o be incorporated by reference, the complaint must make a clear, definite, and substantial reference to the documents") (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012)) (alterations omitted). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir. 2006)). In such a case, it must be clear that no dispute exists concerning the document's authenticity or relevance. *DiFolco*, 622 F.3d at 111.

These rules "prevent[] plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting." *Glob. Network Commc'ns*, 458 F.3d at 157; *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (explaining that in securities fraud cases, were the courts to "refrain from considering" the full text of the documents that plaintiffs allege to be false and misleading, "complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure"). Where a document has been incorporated by reference or deemed integral to the complaint, the court need not accept the plaintiff's description of its contents, "but may look to the [document] itself." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005); *see also Garcia*, 779 F.3d at 88 (accepting as true the facts set forth in plaintiff's complaint "to the extent that they are not

contradicted by the video evidence" incorporated therein by reference); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 483 n.31 (S.D.N.Y. 2005) (Kaplan, J.) (because the contents of a press release were "integral to the allegations against Citibank," the court "consulted and quote[d] from the complete copy submitted by Citigroup" rather than relying on plaintiff's allegations as to its import).

"Of course, [the court] may also consider matters of which judicial notice may be taken under Fed. R. Evid. 201," *Kramer*, 937 F.2d at 773, including the contents of "documents filed in other courts." *Id.* at 774. In deciding a Rule 12(b)(6) motion, the court takes judicial notice of such documents "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Glob. Network Commc'ns*, 458 F.3d at 157 (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)).

If additional evidentiary materials (matters "outside of the pleadings") are "presented to and not excluded by the court" in connection with a Rule 12(b)(6) motion, the motion "must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). "Whether to convert a motion to dismiss into a motion for summary judgment is left to the sound discretion of the district court." *Ashley v. Gonzalez*, 2020 WL 7027501, at *2 (S.D.N.Y. Nov. 30, 2020). In this case, since plaintiff has had no opportunity to conduct discovery, I decline to convert the City Defendants' motion to dismiss into one for summary judgment. Consequently, I must consider which of the documents hyperlinked by plaintiff or submitted by defendants may be considered pursuant to Rule 12(b)(6).

a.    <em>Hyperlinked Articles and Documents</em>

The Amended Complaint quotes from and provides hyperlinks to numerous press articles and editorials, as well as speeches, memoranda, and other written material made available online by the Bragg campaign and (after DA Bragg's election) by the DANY. These materials – the

centerpiece of plaintiff's claim that he was the victim of DANY policies that "provide preferential treatment to criminal defendants who are Black or African-American over other races and ethnicities," Am. Compl. ¶ 2 – are incorporated into the complaint by reference, and consequently may be considered in full by this Court in connection with defendants' Rule 12(b)(6) motions. *See, e.g.*, *Gersbacher v. City of New York*, 134 F. Supp. 3d 711, 718 (S.D.N.Y. 2015) (considering full text of report incorporated by reference and hyperlinked in footnote to complaint).

### b.    Documents Filed in People v. Alba

The Amended Complaint quotes extensively from the Criminal Complaint and the Motion to Dismiss. These documents may also be considered in full by this Court, not only because they are incorporated by reference into plaintiff's civil complaint but also because they are part of the state court file in *People v. Alba*, which is judicially noticeable (albeit not for the truth of its contents). *Glob. Network Commc'ns*, 458 F.3d at 157; *Kramer*, 937 F.2d 767 at 773; *see also Shmueli v. City of New York*, 424 F.3d 231, 233 (2d Cir. 2005) (the New York State "prosecution of Shmueli is a matter of public record, of which we take judicial notice").[14] Consequently, this Court may consider the Criminal Complaint (Francolla Decl. Ex. N; Shoock Decl. Ex. A); the transcripts of plaintiff's July 2, 2022 arraignment and July 7, 2022 bail modification proceeding (Francolla Decl. Exs. O, P), the Motion to Dismiss (*id*. Ex. R; Shoock Decl. Ex. B); and the Certificate of Disposition (Shoock Decl. Ex. C). Additionally, the Court may consider plaintiff's

---

[14] Where, as here, the plaintiff sues for false arrest and/or malicious prosecution, "courts routinely take judicial notice of state court criminal proceedings, including indictments and sentencing transcripts," at the motion to dismiss stage. *Palm v. Brooks*, 2024 WL 1908388, at *1 (S.D.N.Y. May 1, 2024); *accord*, *Floyd v. Rosen*, 2022 WL 1451405, at *2 (S.D.N.Y. May 9, 2022); *see also, e.g.*, *Rowe v. City of N.Y.*, 2020 U.S. Dist. LEXIS 17313, at *10 (S.D.N.Y. Jan. 31, 2020) (all relevant documents filed in plaintiff's criminal case are judicially noticeable, "at least for the fact of their existence and contents"), *adopted*, 2020 U.S. Dist. LEXIS 27190 (S.D.N.Y. Feb. 18, 2020) (Kaplan, J.).

Arrest Report (Francolla Decl. Ex. M), which is a judicially-noticeable public record. *See Harris v. Nassau Cnty.*, 2016 WL 3023265, at *3 (E.D.N.Y. May 24, 2016) ("Matters of public record of which the court may take judicial notice include arraignments, arrest reports, criminal complaints and indictments, and certificates of disposition.").[15]

<blockquote>c.     *Store Videos*</blockquote>

The Store Videos are also expressly referenced and heavily relied on in the Amended Complaint. Plaintiff alleges, among other things, that although DA Bragg did not conclude until July 19, 2021 that plaintiff acted in self-defense,

> This conclusion was apparent to anyone who watched the video, which was immediately available on the evening of the incident. The information, videos and evidence that conclusively demonstrated that Plaintiff had acted in self-defense was available to the detectives, police officers and DA Bragg's office when plaintiff was arrested and before Alba was charged and arraigned.

Am. Compl. ¶ 6; *see also id*. ¶ 49 (the Criminal Complaint "misrepresented the video of the incident"). The Store Videos are thus key to plaintiff's allegation that defendants lacked probable cause to arrest or prosecute him (an essential element of his false arrest and malicious prosecution claims) and to his assertion that defendants misrepresented the evidence in the Criminal Complaint (an essential element of his fair trial claim).

Because the Amended Complaint "explicitly refers to and relies upon" the Store Videos, *Sira*, 380 F.3d at 67, they are deemed incorporated into plaintiff's pleading and may be considered by this Court without converting defendants' motions into summary judgment motions. *See*

---

[15] *Accord McLennon v. New York City*, 2015 WL 1475819, at *4 (E.D.N.Y. Mar. 31, 2015) ("It is well established that a court considering a motion pursuant to Rule 12(b)(6) may take judicial notice of arrest reports, certificates of disposition, criminal complaints, DD5s, and indictments."); *Garcia-Garcia v. City of New York*, 2013 WL 3832730, at *1 n.1 (S.D.N.Y. July 22, 2013) ("Judicial notice may be taken of public records, including 'arrest reports, criminal complaints, indictments, and criminal disposition data.'") (quoting *Wims v. New York City Police Dep't*, 2011 WL 2946369, at *2 (S.D.N.Y. July 20, 2011)).

*Norales*, 2022 WL 17958450, at *1-2 (district court properly considered videotape showing the shooting for which plaintiff was arrested, prosecuted, and acquitted to determine "whether Norales plausibly stated a claim" for false arrest and malicious prosecution); *Kass*, 864 F.3d at 206 (relying in part on video depicting arrest, which the parties conceded to be "authentic and accurate," to reverse and remand with instructions to dismiss false arrest claim pursuant to Rule 12(c)); *Garcia*, 779 F.3d at 87-88 (relying in part on videos and photographs depicting protests and arrests, including videos that plaintiffs "incorporated into the Complaint by reference," to reverse and remand with instructions to dismiss false arrest claim pursuant to Rule 12(b)(6)). Plaintiff does not dispute the authenticity, the relevance, or the accuracy of the Store Videos. To the contrary: In his opposition brief, he continues to argue that defendants lacked probable cause to arrest him because "an exculpatory video demonstrating self-defense was immediately available" to the NYPD personnel, Pl. Mem. at 8; that DA Bragg is not entitled to prosecutorial immunity because even after plaintiff's arrest he was "investigating in an attempt to obtain probable cause, as all he had was an exculpatory video conclusively establishing self-defense or justification and negating probable cause," *id*. at 15; and that he "has stated a claim for denial of a fair trial and due process based on defendants' actions in fabricating evidence by mischaracterizing the video and withholding the exculpatory evidence contained in the video." *Id*. at 36.

In the same brief, however, plaintiff seeks to prevent the Court from considering the Store Videos, citing *Singh v. City of New York*, 2024 WL 319117 (2d Cir. Jan. 29, 2024) (summary order), for the proposition that "juries, not judges, are in the best position to evaluate videos at trial." Pl. Mem. at 5. Additionally, relying on *Lynch v. City of N.Y.*, 952 F.3d 67 (2d Cir. 2020), and *Doe v. New York Univ.*, 2021 WL 1226384 (S.D.N.Y. Mar. 31, 2021), plaintiff argues that a

district court should never consider "photographs, text messages, emails, [or] video recordings on a motion to dismiss, as they [are] not written instruments." *Id*.

Plaintiff's' first argument is meritless. To be sure, some videos are too unclear or ambiguous to permit the court to render a decision. *See Singh*, 2024 WL 319117, at \*5-6 (court should not have granted summary judgment on excessive force claim where video evidence was susceptible of more than one interpretation); *Vincent v. Winski*, 2018 WL 1441370, at \*11 (S.D.N.Y. Mar. 22, 2018) (agreeing to consider footage relied on by plaintiff in connection with defendants' Rule 12(b)(6) motion, but ultimately concluding that the video was too ambiguous "to allow me to infer that [defendants] had arguable probable cause to arrest Plaintiff."). In this case, however, plaintiff asserts that the Store Videos "conclusively" establish that he acted in self-defense and thus that there was no probable cause to arrest or charge him. Am. Compl. ¶ 6; Pl. Mem. at 15. He cannot have it both ways. Moreover, *Singh* – a summary judgment decision – says nothing about what material a district court may consider when resolving a Rule 12(b)(6) motion.

*Lynch* does address that issue, holding that a police officer's memo book, never mentioned in the complaint, was at best "a lead to evidence that might support Lynch's claim" against another defendant, but was not "integral" to that claim. 952 F.3d at 78-79. Additionally, in *dicta*, the *Lynch* court suggested that the phrase "written instrument," found in Rule 10(c), could limit the types of documents that district courts may consider in connection with Rule 12(b)(6) motions. *See id*. at 79 ("The term 'written instrument' generally refers to a legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate.") (cleaned up). However, the Second Circuit has never expressly so held, *see Garcia*, 779 F. 3d at 88 n.2, and in *Norales* – issued two years after *Lynch* – another panel of the same court expressly concluded (albeit in a nonprecedential decision) that the district court did not err in resting its Rule

24

12(b)(6) decision in part on surveillance video that was "integral to the complaint." *Norales*, 2022 WL 17958450, at *2.

The district courts within our Circuit have, for the most part, followed suit. *See*, *e.g*., *Mercado v. City of New York*, 2024 WL 3185963, at *1 n.3 (S.D.N.Y. June 26, 2024) (because the footage submitted by defendants "was specifically referenced by the plaintiffs in their operative complaint and depicts the very events complained-of in the amended complaint, the Court will consider this footage when deciding this [Rule 12(b)(6)] motion."); *Manzi v. Goldfine*, 2024 WL 2943876, at *3-4 (S.D.N.Y. June 10, 2024) ("[T]he Court will consider the body-worn camera footage in adjudicating the motion to dismiss as the footage is incorporated by reference and integral to the Second Amended Complaint."); *Palm*, 2024 WL 1908388, at *2 ("Courts specifically may consider video footage at the motion to dismiss stage when the footage is referenced in the complaint and '[k]ey allegations in the complaint rest[ ] on the . . . video.'") (quoting *Norales*, 2022 WL 17958450, at *2); *Forrest v. Cnty. of Greene*, 676 F. Supp. 3d 69, 72 n.1 (N.D.N.Y. 2023) ("the court will consider the videos as part of the amended complaint"), *reconsideration denied*, 2023 WL 5097970 (N.D.N.Y. Aug. 9, 2023); *Cook v. Dubois*, 2021 WL 91293, at *2 (S.D.N.Y. Jan. 11, 2021) (relying on prison surveillance video to dismiss case pursuant to Rule 12(b)(6) after finding that the footage was "incorporated by reference"); *Vincent*, 2018 WL 1441370, at *6 (accepting as true, for purposes of defendants' Rule 12(b)(6) motion, "the facts set forth in the amended complaint to the extent they are not contradicted by the video evidence" that plaintiff "relied on in his pleading").[16]

---

[16] In *Doe v. N.Y. Univ*., cited by plaintiff, the court excluded various items of evidence from consideration on defendants' Rule 12(b)(6) motion, including a 350-page investigation summary report (ISR) submitted to the NYU disciplinary body that heard sexual misconduct charges against plaintiff, explaining that "[t]he ISR and all of the evidentiary record included in it is not 'integral' to the complaint.'" 2021 WL 1226384, at *12. In reaching this conclusion, the *Doe* court relied on

Here, as in the cases cited above, plaintiff expressly relies on specific videos to satisfy his pleading burden as to his false arrest, malicious prosecution, and fair trial claims. The Store Videos, he alleges, "conclusively demonstrated" that he was justified in killing Simon, but were "misrepresented" in the Criminal Complaint. Am. Compl. ¶¶ 6, 49. Having incorporated the Store Videos into the Amended Complaint by reference – and having made their contents "integral to [his] allegations," *In re Parmalat*, 376 F. Supp. 2d at 483 n.31 – plaintiff cannot expect the Court to accept his account of what the videos show over what the videos actually show. Consequently, this Court may consider the Store Videos (Francolla Decl. Exs. A through A-10) in connection with defendants' Rule 12(b)(6) motions.

>    d.    *Interrogation Videos*

Plaintiff does not object to the Court's consideration of the Grady Interrogation Video and the Alba Interrogation Video. Although these videos are not incorporated by reference, they are

---

*Lynch*, which it read as *holding* that only "written instruments . . . defining rights, duties, entitlements, or liabilities" could qualify for consideration in connection with a Rule 12(b)(6) motion. *See id.* at *11 ("The conclusion in *Lynch* was not dicta – it was essential to the court's holding – so the Court will embrace its holding here."). More recently, in *Jackson v. Nassau Cnty.*, 552 F. Supp. 3d 350 (E.D.N.Y. 2021), a judge in our sister district agreed with *Doe* and read *Lynch* as prohibiting it from considering any documents outside the body of the complaint, for purposes of a Rule 12(b)(6) motion, other than "written instruments" that "define rights, duties, entitlements, or liabilities." *Id.* at 366-67.

I respectfully disagree with *Doe* and *Jackson* on this point. I do not read the relevant passage in *Lynch* as essential to the holding of that case. As noted above, the panel concluded that the officer's memo book was not "integral to the complaint" for reasons having nothing to do with whether it was an "instrument" such as a "statute, contract, will, promissory note, or share certificate." *Lynch*, 952 F.3d at 79. Had the Court of Appeals intended to sweep away dozens of precedential cases permitting district courts to consider a wide variety of "documents" and "materials" that were attached to, incorporated into, or integral to the complaint, *see*, *e.g.*, *L-7 Designs*, 647 F.3d at 422 (collecting cases and approving district court's consideration of five "email exhibits" in connection with a Rule 12(c) motion), it would have done so more clearly. Finally, I cannot square the *Doe* court's reading of *Lynch* with *Norales*, issued two years later, in which an appellate panel approved the district court's consideration of surveillance video as "integral to the complaint" without mentioning either Rule 10(c) or *Lynch*.

integral to the Amended Complaint, in the sense that plaintiff clearly had notice of the videos and relied upon them in framing his pleading, which makes specific allegations as to what he and Grady did and did not say during their interrogations. *See* Am. Compl. ¶¶ 46-47. In his brief in opposition to defendants' motions to dismiss, plaintiff continues to argue that defendants lacked probable cause to prosecute him because, among other things, Grady made no "inculpatory statements" during her interrogation. Pl. Mem. at 6, 9. Accordingly, this Court may consider the interrogation videos (Francolla Decl. Exs. G, I) for the limited purpose of confirming what Grady and Alba told the NYPD at the precinct before Alba was charged, by complaint, with murder.

### e.    Other Documents

It is not clear whether plaintiff objects to the Court's consideration of the body-worn camera footage submitted by the City Defendants. *See* Pl. Mem. at 5-6. However, as the City Defendants admit, *see* City Mem. at 7, the Amended Complaint does not mention the BWC footage, and nothing in the pleading allows me to conclude that plaintiff or his counsel relied upon that footage in drafting it.[17] I therefore decline to consider the BWC footage (Francolla Decl. Exs. D, E, F). *See Ashley*, 2020 WL 7027501, at *2 ("extraneous videos documenting the events in question are not properly considered on a motion to dismiss unless the plaintiff relied upon the videos when drafting the complaint.").

I also decline to consider the 40-page Detective File (Francolla Decl. Ex. B), which documents the investigatory work performed by the NYPD from July 1 through July 19, 2022. The Amended Complaint does allege – briefly – that "the detective reports indicate that the investigation was still taking place even after Plaintiff was charged and arraigned." Am. Compl.

---

[17] If counsel had reviewed the BWC footage before signing the Amended Complaint, he could not have asserted, in good faith, that Grady "provided no inculpatory information regarding plaintiff's actions on the scene to justify a homicide arrest." Am. Compl. ¶ 45.

at 25 (second ¶ 56). But this does not constitute a "clear, definite, and substantial reference," as required to deem a document incorporated by reference. *Dunkelberger*, 2015 WL 5730605, at *5. Moreover, nothing hangs upon plaintiff's allegation that the NYPD (as opposed to the DANY), was still investigating. Thus, although plaintiff may have reviewed the Detective Report, I cannot conclude that he "relied" on it in drafting his pleading to the extent required to render it "integral" to the complaint. *DiFolco*, 622 F.3d at 111. Finally, while the Store Videos are properly reviewed to confirm their content, it is apparent from the City Defendants' motion papers that they have proffered the Detective File for the *truth* of its contents, which would be impermissible even if the file were integral to the complaint or judicially noticeable. *See*, *e.g*., City SMF ¶¶ 2, 36, 39 (relying on the Detective File to support defendants' assertions as to various facts reported therein, including that "[w]itnesses to the stabbing called 911 and reported that the store owner of the Blue Moon Convenience Store had stabbed a customer with a knife" and that Grady told the police, at the scene, "that plaintiff had stabbed Mr. Simon").

For similar reasons, I decline to consider the "iCad," listing NYPD calls on the night of July 1, 2022 (Francolla Decl. Ex. B); the Autopsy Report on Austin Simon (*id*. Ex. J); plaintiff's medical records from Harlem Hospital (*id*. Ex. K); or the transcript of plaintiff's "50-h hearing." *Id*. ¶ L. While these documents are undoubtedly relevant to this action, and in some cases contradict the allegations in the Amended Complaint,[18] that is not enough to permit this Court to consider them in connection with a pleading motion designed to test "the formal sufficiency of the plaintiff's statement of a claim for relief[.]" *Glob. Network Commc'ns*, 458 F.3d at 155.

---

[18] For example, the Harlem Hospital records confirm that plaintiff's wounds were treated between 1:00 and 2:00 a.m. on July 2, 2022, after he was arrested but well before he was interrogated at the 30th Precinct. *Cf*. Am. Compl. ¶ 47 ("Plaintiff was interrogated at the precinct by Detectives Garcia and Pagan and a third detective before being taken for medical care.").

### B.      Plaintiff's Claims Against DA Bragg Are Barred by Prosecutorial Immunity

Plaintiff seeks damages from DA Bragg (the only "District Attorney Defendant" identified in the Amended Complaint) in the following claims:

- Claim 3, brought pursuant to § 1983 for malicious prosecution in violation of the Fourth Amendment, Am. Compl. ¶ 87;

- Claim 4, brought pursuant to § 1983 for disparate treatment and selective prosecution in violation of the Equal Protection Clause, *id.* ¶ 91;

- Claim 5, brought pursuant to § 1983 for "violation of due process and a fair trial" in violation of the Fifth, Sixth, and Fourteenth Amendments, *id.* ¶ 95;

- Claim 7, brought pursuant to § 1983 for failure to intervene, *id.* ¶ 103;

- Claim 8, brought for disparate treatment and selective prosecution pursuant to Title VI of the Civil Rights Act of 1964, *id.* ¶¶ 107-09; and

- Claim 14, brought pursuant to state law for malicious prosecution. *Id.* ¶ 137.[19]

It is by now "well settled" that state prosecutors are entitled to "the same absolute immunity under § 1983 that [they] enjoy[] at common law." *Imbler v. Pachtman*, 424 U.S. 409, 424, 427 (1976). Under federal law, prosecutorial immunity is "broadly defined, covering virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate." *Kroemer v.*

---

[19] As noted above, plaintiff has withdrawn Claim 6, brought under 42 U.S.C. § 1981 against the Detective and District Attorney Defendants. *See* Pl. Mem. at 37. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to . . . the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). However, "§ 1981 does not provide a separate private right of action against state actors," *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018), who must be sued under § 1983, if at all, for "violation of the rights declared in § 1981." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731 (1989).

Plaintiff states that he has also withdrawn Claim 4, brought under the Equal Protection Clause, insofar as it is "based on selective prosecution or a 'class of one' theory," Pl. Mem. at 39, while continuing to assert "an Equal Protection Claim based on disparate treatment." *Id*. As pleaded, however, plaintiff's Equal Protection claim against DA Bragg *is* a selective prosecution claim. *See* Am. Compl. ¶ 2 (plaintiff was "wrongfully prosecuted because he is not Black"); *id*. ¶ 91 (DA Bragg "selectively prosecut[ed] him because of his race"). As against DA Bragg, therefore, it is not clear what, if anything, remains of Claim 4.

*Tantillo*, 758 F. App'x 84, 86-87 (2d Cir. 2018) (summary order) (quoting *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995)) (alteration in original). A prosecutor acting within his jurisdiction is "shielded from liability for damages for commencing and pursuing the prosecution, regardless of any allegations that his actions were undertaken with an improper state of mind or improper motive." *Shmueli*, 424 F.3d at 237; *see also Anilao v. Spota*, 27 F.4th 855, 868 (2d Cir. 2022) (holding that Suffolk County prosecutors were "absolutely immune" for their "prosecutorial and advocative conduct even in the absence of probable cause and even if their conduct was entirely politically motivated"), *cert. denied*, 143 S. Ct. 1781 (2023). New York law is in accord. *Shmueli*, 424 F.3d at 238; *see also Rudow v. City of New York*, 822 F.2d 324, 329 (2d Cir. 1987) ("In New York, absolute immunity extends not only to the prosecutorial function, but to numerous public functions involving the exercise of discretion in a judicial or quasi-judicial nature.") (internal citations omitted).[20]

Although "the initiation and pursuit of a criminal prosecution" are the "quintessential prosecutorial functions" protected by absolute immunity, *Shmueli*, 424 F.3d at 237, the doctrine is not limited to "the act of initiation itself," nor to "conduct occurring in the courtroom," but extends to any "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State[.]" *Buckley v. Fitzsimmons*, 509 U.S. 259, 272-73 (1993). Shielded conduct may include "actions preliminary to the initiation of a prosecution and actions apart from the courtroom," such as making decisions on

---

[20] Plaintiff cannot avoid the bar of prosecutorial immunity by suing DA Bragg (in Claim 14) under the New York City Administrative Code. Section 8-804 states that "[i]t is not a defense to liability pursuant to this chapter that a covered individual has qualified immunity or any other substantially equivalent immunity." The term "covered individual," however is defined in § 8-801 to mean NYPD employees and "special patrolmen." N.Y.C. Admin. Code § 8-801. DA Bragg and other DANY personnel are not "covered individuals" under the ordinance.

"whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, [and] whether to dismiss an indictment," as well as "obtaining, reviewing, and evaluating" evidence in preparation for the initiation of charges or for trial. *Imbler*, 424 U.S. at 431 n.33; *see also Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013) (absolute immunity protects prosecutor when "deciding whether to bring charges and presenting a case to a grand jury or a court, along with the tasks generally considered adjunct to those functions"). "Absolute immunity also extends to persons 'who act under [a prosecutor's] direction in performing functions closely tied to the judicial process.'" *Simon*, 727 F.3d at 171-72 (quoting *Hill*, 45 F.3d at 660) (alteration in original).

However, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley*, 509 U.S. at 273 (holding that prosecutors were not absolutely immune from the claim that they fabricated false evidence tying plaintiff to the scene of a murder during their "preliminary investigation," months before any arrest was made, when their "mission" was "entirely investigative"); *see also Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (holding that by "orchestrating a sting designed to catch [plaintiff] accepting a bribe," the defendant ADA was "doing police work in the hope that his target would succumb to temptation and thereby furnish evidence on which a prosecution could be based," and therefore was entitled only to qualified immunity). As the Court of Appeals explained in *Smith*:

> [T]he Supreme Court has sought to draw a line between those preparatory steps that a prosecutor takes to be an effective advocate of a case already assembled and those investigative steps taken to gather evidence. The Court has identified 'evaluating evidence and interviewing witnesses' as falling on the absolute immunity side of the line, leaving 'searching for the clues and corroboration' that might lead to a recommendation for an arrest on the qualified immunity side.

147 F.3d at 94 (quoting *Buckley*, 509 U.S. at 273)

DA Bragg argues that since all of plaintiff's claims against him "concern the DA's exercise of discretion as to whether to commence and continue a prosecution of plaintiff, as well as the conduct of that prosecution itself," this action should be dismissed as against him "pursuant to absolute prosecutorial immunity." Bragg Mem. at 5, 9. Plaintiff responds that DA Bragg is not entitled to absolute immunity because "he was still in the investigative phase from the drafting of the accusatory instrument until he dismissed the case," Pl. Mem. at 15, and because when he "instituted his racial equality policies . . . he was acting as the administrator of the office, for which absolute immunity is not available." *Id*. Plaintiff adds that, by conducting the prosecution in a "racially discriminatory manner," DA Bragg acted "without any colorable claim of authority" and consequently is not entitled to absolute immunity. *Id*. at 23-24 (citing *Daniels v. City of Binghamton*, 1998 WL 357336 (N.D.N.Y. June 29, 1998)).

Plaintiff is mistaken. First, while he has clearly alleged that the DANY continued "investigating" the Simon homicide after plaintiff was arrested, *see* Am. Compl. ¶ 5; *id*. at 24 (second ¶ 56), he has not thereby shown that DA Bragg was functioning "outside his . . . role as an advocate for the People[.]" *Hill*, 45 F.3d at 661. As the Court of Appeals explained in *Giraldo v. Kessler*, 694 F.3d 161 (2d Cir. 2012), "not every interview, interrogation, or other act by a prosecutor with the potential of revealing new information is an investigative act entitled to only qualified immunity. Good prosecutors may – usually should – perform acts reasonably characterized as investigative at all phases of a criminal proceeding. The investigative acts that are entitled to only qualified immunity are those undertaken in the phase of law enforcement that involves the gathering and piecing together of evidence for indications of criminal activities and determination of the perpetrators." *Id*. at 166 (holding that prosecutors' conduct in questioning suspect's girlfriend after his arrest was "well within their legitimate functions as prosecutors"

because "legal decisions at the core of the prosecutorial function – pursuit of the charges, arraignment, bail, etc. – had to be made by [the prosecutors] and made quickly").

Plaintiff does not claim that the DANY's post-arrest investigation "involve[d] the gathering and piecing together of evidence for indications of criminal activities and determination of the perpetrators." *Giraldo*, 694 F.3d at 166. This is not a case where prosecutors were looking for evidence to tie a suspect to the homicide, *cf. Buckley*, 509 U.S. at 273, or performing "police work" to set up an arrest. *Cf. Smith*, 147 F.3d at 94. Rather, plaintiff alleges, DA Bragg was "continuing to *review* the evidence," Am. Compl. at 24 (second ¶ 56) (emphasis added), and, having done so, decided to dismiss the case rather than present it to a grand jury. *Id*. ¶ 64.[21] Like the decision to initiate charges, the decision to end a criminal case is a quintessential prosecutorial function. *See Imbler*, 424 U.S. at 431 n.33 (prosecutorial functions include making decisions on "whether to present a case to a grand jury" and "whether to dismiss an indictment"); *Simon*, 727 F.3d at 171 (absolute immunity protects prosecutor when "deciding *whether* to bring charges") (emphasis added). Thus, "investigative acts reasonably related to decisions *whether or not* to begin or to carry on a particular criminal prosecution" are "shielded by absolute immunity when done by prosecutors." *Giraldo*, 694 F.3d at 166 (emphasis added).[22] Nothing in the Amended Complaint decouples the DANY's post-arraignment investigation from DA Bragg's decision to drop the

---

[21] These allegations are consistent with the Motion to Dismiss itself, which stated that the purpose of the DANY's investigation was to "develop sufficient factual information to enable the prosecutor to make a fair and objective determination of whether and what charges should be brought and to guard against prosecution of the innocent." Mot. to Dismiss at ECF pp. 4-5 (quoting *ABA Standards for Criminal Justice: Prosecutorial Investigations*, Standard 26-1.2(c)(i)).

[22] As the DANY noted when moving to dismiss the charges against plaintiff, "[i]t is familiar doctrine that a prosecutor serves a dual role as advocate and public officer. He is charged with the duty not only to seek convictions but also to see that justice is done." Mot. to Dismiss at ECF p. 17 (quoting *People v. Pelchat,* 62 N.Y.2d 97, 105, 464 N.E.2d 447, 451 (1984)).

case.[23] Consequently, plaintiff has failed to show that the DANY's investigatory activities fell outside of the protection afforded by absolute prosecutorial immunity.

Second, plaintiff's claims against DA Bragg do not arise out of his investigatory activities. Rather, they arise out of conduct that took place on July 2, 2022, and that unquestionably qualifies for absolute prosecutorial immunity: the decision to charge plaintiff with murder, allegedly without probable cause and for improper motives, *see* Am. Compl. ¶¶ 49, 87, 91, 137; the presentation of an accusatory instrument, which allegedly "convey[ed] false information" about the contents of the Store Videos, *id*. ¶¶ 50, 95; and the request for high bail at plaintiff's arraignment, predicated on the murder charge and the Criminal Complaint. *Id*. ¶¶ 1, 5, 52; *id* at 24 (second ¶ 56). "Well established case law recognizes such conduct to lie at the very core of a prosecutor's role as an advocate engaged in the judicial phase of the criminal process." *Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 503 (2d Cir. 2004). As the Supreme Court explained in *Buckley*, the prosecutorial immunity analysis necessarily "focuses on the conduct for which immunity is claimed[.]" 509 U.S. at 271. Thus, even if DA Bragg were not entitled to absolute immunity for his post-arrest investigation, the claims against him should be dismissed, because the post-arrest investigation did not cause any of the harms of which plaintiff complains. Conversely, plaintiff does not (and could not) contend that the initial decision to prosecute him, the presentation of the Criminal Complaint, or the request for bail fell outside of DA Bragg's core advocacy functions. As to these acts, "absolute immunity applies to protect the prosecutor even in the face of [plaintiff's] allegations of

---

[23] Moreover, none of the additional facts that plaintiff proposes to allege if given leave to amend would cure this defect. *See* Pl. Mem. at 16 (explaining that his second amended complaint would assert that DA Bragg met with an association of bodega owners and told them that he was still investigating the Alba case and "was considering a dismissal." If anything, these allegations would underscore that DA Bragg's post-arrest investigation was "reasonably related to decisions whether or not to . . . carry on a particular criminal prosecution," and thus was "shielded by absolute immunity[.]" *Giraldo*, 694 F.3d at 166.

malicious or corrupt intent behind the acts. Otherwise, the absolute immunity would not be absolute." *Giraldo*, 694 F.3d at 166 (internal citations omitted).

Finally, plaintiff cannot escape the bar of prosecutorial immunity by characterizing DA Bragg's alleged institution of "racial equality policies" as an "administrative" rather than a prosecutorial function, nor by arguing that racially-motivated prosecutions are outside of a prosecutor's "authority." A DA's "administrative" functions concern matters *other* than prosecutorial policy, such as "workplace hiring, payroll administration, the maintenance of physical facilities, and the like." *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009) (holding that DA was absolutely immune from claims that he failed to set up an adequate system to train ADAs and manage impeachment-related information).[24] Moreover, it has been well-settled since at least 2004 that allegations of "racially invidious" prosecutions do not overcome the bar of absolute prosecutorial immunity. *Bernard*, 356 F.3d at 504.[25]

---

[24] *Van de Kamp* also teaches that if a trial prosecutor is immune from suit, her supervisors and colleagues are likewise immune from claims that they failed to detect and/or correct her alleged misconduct. 555 U.S. at 345 ("[A]ll these prosecutors would enjoy absolute immunity from such a suit."). Thus, prosecutorial immunity bars all of plaintiff's claims against DA Bragg, including Claim 7, brought on a failure-to-intervene theory. *See* Am. Compl. ¶ 103.

[25] In *Daniels* (decided in 1998), the district court stated that a prosecutor "would not be immune if the prosecution was conducted in a racially discriminatory manner, rendering his acts beyond the scope of his official duties." 1998 WL 357336, at *4. In his opposition brief, plaintiff relies on *Daniels* for this proposition, *see* Pl. Mem. at 23-24, without mentioning that six years later, in *Bernard*, the Second Circuit repudiated *Daniels* on precisely the same point, holding that while "racially invidious or partisan prosecutions, pursued without probable cause, are reprehensible," such motives "do not necessarily remove conduct from the protection of absolute immunity." *Id.* at 504. The Court of Appeals explained that a prosecutor has "authority" to prosecute all crimes within his statutory remit, and when doing so is protected by absolute immunity, regardless of "whether [the] authorized acts are performed with a good or bad *motive*," unless he has "linked his authorized discretion to initiate or drop criminal charges to an unauthorized demand," such as a demand for "a bribe, sexual favors, or the defendant's performance of a religious act." *Id.* In the absence of any such unauthorized demands (which are not alleged here), "the fact that improper motives may influence his authorized discretion cannot deprive him of absolute immunity." *Id.*; *see also, e.g.*, *Strong v. Watson*, 2023 WL 8439445, at *3, 7-8 (W.D.N.Y. Sept. 26, 2023) (absolute immunity required dismissal of malicious prosecution claims against Niagara County prosecutors,

Plaintiff cannot plead around that bar. *See* n.23, *supra*. Consequently, Claims 3, 4, 5, 6, 7, 8, and 14 – to the extent not already withdrawn – should be dismissed with prejudice as against DA Bragg. Additionally, claim 10, asserted against the City under *Monell*, should be dismissed because it is based solely on DA Bragg's allegedly discriminatory prosecutorial policies. *See* Am. Compl. ¶ 119. Not only is the underlying claim against DA Bragg barred by prosecutorial immunity; "the City of New York is not a liable party" with respect to prosecutorial (as opposed to administrative or managerial) misconduct by the elected New York County district attorney. *Jones v. City of New York*, 988 F. Supp. 2d 305, 317 (E.D.N.Y. 2013).

### C.    Plaintiff Fails to State a Claim for Race-Based Discrimination

Plaintiff seeks damages for race discrimination in the following claims:

- Claim 4, brought pursuant to § 1983 for selective prosecution and/or disparate treatment in violation of the Equal Protection Clause, Am. Compl. ¶ 91, and

- Claim 8, brought pursuant to Title VI of the Civil Rights Act of 1964. *Id.* ¶¶ 107-09.[26]

The gravamen of both claims is that plaintiff was "treated more harshly" by police and prosecutors alike, Am. Compl. ¶ 2, because he was "not Black" and/or because the deceased, Simon, was Black. *Id.* ¶¶ 2, 6, 7, 19, 36, 38, 51, 58, 91, 99, 109. The Equal Protection claim is asserted against

---

notwithstanding plaintiff's allegation that defendants' conduct was motivated by "racism targeting a Black African American Father and his family and depriving them of equal rights under the law"), *adopted*, 2023 WL 7647780 (W.D.N.Y. Nov. 15, 2023); *Meadows v. Buffalo Police Dep't*, 2023 WL 1109747, at *4, *7 (W.D.N.Y. Jan. 30, 2023) (absolute prosecutorial immunity barred claim that Erie County DAs made charging decisions based on "racial bias"), *reconsideration denied*, 2024 WL 1142092 (W.D.N.Y. Mar. 14, 2024); *Koltun v. Berry*, 2013 WL 3816603, at *8 (S.D.N.Y. July 19, 2013) (Orange County prosecutors were "absolutely immune from liability" for their decision to prosecute plaintiff for murder, notwithstanding Koltun's allegation "that the prosecution was based on ethnic and religious discrimination and without probable cause").

[26] Additionally, in Claim 7 plaintiff alleges that each individual defendant is liable for the misconduct committed by every other individual defendant on a "failure to intervene" theory, *see* Am. Compl. ¶ 103, and in Claim 10 he alleges that the City is liable, under *Monell*, "for the discriminatory policies and practices of DA Bragg and his office." *Id.* ¶ 119.

every individual defendant named in the Amended Complaint (except Commissioner Molina). The Title VI claim is asserted against the City and DA Bragg. *See id.* ¶ 107 (explaining that Bragg is named because there "is no legal distinction between a District Attorney's office, a non-suable entity, and the District Attorney himself").

The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985). Equal Protection violations by state and local officials may be redressed under 42 U.S.C. § 1983, which permits civil suits against those who, acting "under color" of state law, have deprived the plaintiff of "any rights, privileges, or immunities secured by the Constitution" or laws of the United States. In order to state a § 1983 claim for violation of the Equal Protection Clause, a plaintiff must plead facts demonstrating (i) that he was treated differently from others "similarly situated," and (ii) "that such selective treatment was based on impermissible considerations such as race." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 234 (2d Cir. 2004) (quoting *Lisa's Party City, Inc. v. Town of Henrietta,* 185 F.3d 12, 16 (2d Cir. 1999)); *accord Brown v. City of Syracuse*, 673 F.3d 141, 151-52 (2d Cir. 2012); *Guillen v. City of New York*, 625 F. Supp. 3d 139, 157 (S.D.N.Y. 2022). "A plaintiff 'must satisfy both elements'" to state a claim. *Bar-Levy v. Gerow*, 2020 WL 814925, at *5 (S.D.N.Y. Feb. 19, 2020) (quoting *LaTrieste Restaurant v. Vill. of Port Chester*, 188 F.3d 65, 70 (2d Cir. 1999)). "The elements of a selective prosecution claim are the same, except plaintiff must prove under the first prong that others similarly situated have not generally been prosecuted for the same type of conduct, and that plaintiff was singled out for prosecution."

*Guillen*, 625 F. Supp. 3d at 158 (quoting *Anderson v. City of New York*, 817 F. Supp. 2d 77, 94 (E.D.N.Y. 2011)).[27]

"As to the first element of an Equal Protection claim, plaintiffs are required to plead facts that, if proved, would establish that they, 'compared with others similarly situated, w[ere] selectively treated.'" *Tshaka v. Benepe*, 2003 WL 21243017, at *3 (E.D.N.Y. Apr. 9, 2003) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)) (alteration in original). "Without an allegation that other persons similarly situated were treated differently, the 'equal' portion of the Equal Protection clause becomes meaningless." *Id.* (quoting *Economic Opportunity Comm'n of Nassau County, Inc. v. County of Nassau,* 106 F. Supp. 2d 433, 441 (E.D.N.Y. 2000)). "For example, if a plaintiff seeks to prove selective prosecution on the basis of his race, he 'must show that similarly situated individuals of a different race were not prosecuted.'" *Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2000) (quoting *United States v. Armstrong,* 517 U.S. 456, 465 (1996)).[28] Detailed evidence is not required at the pleading stage. However, "[w]ell-pled facts[,] showing 'that the plaintiff has been treated differently from others similarly situated, remains an essential component of such a claim.'" *Bishop v. Best Buy, Co. Inc.*, 2010 WL 4159566, at *11 (S.D.N.Y. Oct. 13, 2010) (quoting *Sweeney v. City of New York,* 2004 WL 744198, at *5 (S.D.N.Y. Apr. 2, 2004)), *on reconsideration,* 2011 WL 4011449 (S.D.N.Y. Sept. 8, 2011), and *aff'd sub nom. Bishop v. City of New York*, 518 F. App'x 55 (2d Cir. 2013).

---

[27] As noted above, plaintiff states that he has withdrawn his Equal Protection claim insofar as it alleges "selective prosecution." Pl. Mem. at 39. As against DA Bragg, however, plaintiff's Equal Protection claim *is* a selective prosecution claim. *See* Am. Compl. ¶ 91; Pl. Mem. at 44 (arguing that DA Bragg charged him with murder in the second degree, rather than deferring prosecution or charging him with "lesser included offenses," "because of the races of plaintiff and Simon"). I must therefore consider whether he has plausibly alleged a selective prosecution claim.

[28] "[I]t is not necessary to plead the existence of a similarly situated non-minority group when challenging a law or policy that contains an express, racial classification." *Brown*, 221 F.3d at 337. That exception does not apply here.

To satisfy the second prong, the plaintiff must show "personal involvement" and "purposeful discrimination" by each named defendant. *Reynolds v. Barrett*, 685 F.3d 193, 204 (2d Cir. 2012); *see also Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019) ("If [an individual] defendant has not *personally* violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant.") (alteration in original; citation omitted). Additionally, the plaintiff's factual allegations must be sufficient to raise the plausible inference that his race (or other protected characteristic) was the "but-for" cause of the mistreatment of which he complains. *Reynolds*, 685 F.3d at 213-14. Again, conclusory allegations will not do. "A plaintiff's naked allegation that the defendant acted based on the plaintiff's race and color is too conclusory to survive a motion to dismiss." *Bentley, Jr. v. Mobil Gas Station*, 599 F. App'x 395, 396 (2d Cir. 2015) (summary order).

Title VI of the Civil Rights Act, like § 1983, permits civil suits for "intentional" discrimination, *Students for Fair Admissions,* 600 U.S. at 288 (Gorsuch, J., concurring); *Idlibi v. Burgdorff*, 2024 WL 3199522, at *4 (2d Cir. June 27, 2024), against "entities" that receive federal financial aid. 42 U.S.C. § 2000d. In such a suit, it is sufficient to show that "the discrimination was a substantial or motivating factor for the defendant's actions." *Idlibi*, 2024 WL 3199522, at *4 (quoting *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001)). However, a Title VI plaintiff, like a § 1983 plaintiff, must show that he was treated "differently" on account of his race. *See Freckleton v. Mercy Coll. NY*, 2023 WL 2648827, at *7 (S.D.N.Y. Mar. 27, 2023) (dismissing Title VI race discrimination complaint because plaintiff "fails to point to any similarly situated students who have been treated differently"). Additionally, he must plead and prove that he was "an entitled beneficiary of the program or activity receiving the aid." *Id.* at *4 (quoting *Babiker v.*

*Ross Univ. Sch. of Med.*, 2000 WL 666342, at *4 (S.D.N.Y. May 19, 2000), *aff'd*, 86 F. App'x 457 (2d Cir. 2004)).

### 1.    Differently From Others Similarly Situated

Insofar as plaintiff's claims for race-based discrimination are asserted against DA Bragg, they should be dismissed on prosecutorial immunity grounds. *See* Part II(B), *supra*. Alternatively, they should be dismissed against all relevant defendants – including DA Bragg – because, while plaintiff alleges in conclusory terms that defendants treated him "differently because he is not Black," Am. Compl. ¶¶ 91, 99, he fails to allege that he was treated differently from others "similarly situated." As DA Bragg points out, the Amended Complaint does not identify "a single Black criminal defendant who is or was similarly situated to Alba" but was *not* arrested, *not* charged with murder, or *not* required to post substantial bail – after taking the life of another person in circumstances analogous to those presented here. Bragg Mem. at 20.[29] Nor does plaintiff show that "individuals outside the protected class committed roughly the same crime in roughly the same circumstances but were not prosecuted," as required to proceed on a selective prosecution theory. *United States v. Parnas*, 2021 WL 2981567, at *7 (S.D.N.Y. July 14, 2021).

---

[29] Plaintiff does allege that Simon's girlfriend, Grady, "was not arrested and prosecuted for stabbing Alba, or for inciting Simon to attack Alba." Am. Compl. ¶ 6; *see also* Pl. Mem. at 1 (arguing that plaintiff "was deprived of his liberty and prosecuted because he is not Black and because Simon, the alleged victim, was Black," whereas Grady "was not arrested or prosecuted despite her criminal acts because of her race"). For Equal Protection purposes, however, the plaintiff must identify comparators who are "similarly situated in all material respects." *Hu v. City of New York*, 2023 WL 3563039, at *1 (2d Cir. May 19, 2023) (summary order); *Shumway v. United Parcel Serv. Inc.*, 118 F.3d 60, 64 (2d Cir. 1997). Plaintiff and Grady were not similarly situated in any material respect. Plaintiff was the first person in the Blue Moon to reach for a weapon, which he used to kill Simon. Store Videos (Exs. A, A-4, A-9). Grady did not intervene in the altercation until plaintiff began stabbing Simon, and even then she initially attempted simply to grab plaintiff's knife arm. *Id.* (Exs. A, A-4). When she did take out her own knife, she aimed it at that same arm. *Id.* Most significantly, Grady did not kill anyone.

Where, as here, a plaintiff has failed to plead the first element of his Equal Protection and Title VI claims, dismissal is required. *See*, *e.g*., *Lanning v. City of Glens Falls*, 908 F.3d 19, 29 (2d Cir. 2018) (Equal Protection claim was properly dismissed where plaintiff "failed to allege any examples" of similarly situated individuals treated more favorably), *abrogated on other grounds by Thompson v. Clark*, 596 U.S. 36 (2022)); *Pagan v. Gagne*, 2022 WL 1239952, at *4 (D. Conn. Apr. 27, 2022) (dismissing Equal Protection claim where plaintiff, who allegedly received poor mental health care because he was Hispanic, failed to show "that similarly situated, non-Hispanic individuals were treated more favorably so as to raise an inference of discriminatory conduct"); *Bar-Levy*, 2020 WL 814925, at *5 (dismissing where plaintiffs, who claimed "that Defendants targeted them because they are Jewish," failed to "allege any other comparator to which this Court can look to infer a selective enforcement scheme, let alone that Plaintiffs were treated differently than the unidentified comparator"); *B. Braxton/Obed-Edom v. City of New York*, 368 F. Supp. 3d 729, 740 (S.D.N.Y. 2019) (dismissing where plaintiff, who claimed that prison officials failed to protect him from violence because of his LGBT status, did not "allege any facts regarding similarly situated inmates who were treated differently"); *Durham v. City of New York*, 2019 WL 1316472, at *4 (S.D.N.Y. Mar. 22, 2019) (dismissing where plaintiff, who claimed he was arrested by NYPD officers because he was a "black male," provided "no evidence of others similarly situated"); *Leneau v. Ponte*, 2018 WL 566456, at *6 (S.D.N.Y. Jan. 25, 2018) (dismissing where plaintiff, who claimed that corrections officer mistreated him because he was Black, failed to plead "any facts to suggest that inmates outside of his protected class – for example, Caucasian inmates – were treated better than he").

Instead of showing that he was treated *differently from* (and less favorably than) Black defendants in similar circumstances, plaintiff alleges that his case is *similar to* two recent

prosecutions against other "not Black" individuals who (in plaintiff's view) were also treated harshly by the DANY. Neither case is comparable to *People v. Alba*.[30] But even if they strongly resembled the case at bar, they would not provide any basis for this Court to infer that DA Bragg violated the Equal Protection Clause, which requires only that similarly-situated persons be treated "alike." *City of Cleburne,* 473 U.S. at 439. I note here as well that, although plaintiff seeks leave to further amend his complaint, he does not contend that he *could* plead the facts required to satisfy the first prong of his Equal Protection claim. To the contrary: in his reply brief, he relies on employment discrimination cases brought under other statutes to assert, incorrectly, that he is not required to show that there are any "'similarly situated' individuals who received preferential treatment based on race." Pl. Reply at 4. Permitting plaintiff to amend his discrimination claims would therefore be futile.

---

[30] Plaintiff's first example is a pending case against Daniel Penny, a "White 24-year-old male" who was indicted for second-degree manslaughter after he used a chokehold to kill "a homeless and dangerously mentally ill Black man, who was terrorizing, threatening and menacing Penny and his fellow passengers on a subway car." Am. Compl. ¶ 28. According to press reports, Penny is scheduled to go to trial in October 2024. *See* https://nypost.com/2024/03/20/us-news/daniel-penny-to-go-on-trial-for-manslaughter-in-october-judge-says. It is not clear whether plaintiff believes that the charges against Penny should have been dropped (as in Alba's case) or whether he should have been charged with a lesser offense, or none at all, at the outset.

Plaintiff's second example is a now-resolved case against Miya Ponsetto, a 23-year-old "White and Filipino" woman who was charged with unlawful imprisonment in the second degree, as a hate crime, after what plaintiff describes as "a minor physical altercation with a young Black man, arising from a dispute over a cellphone[.]" Am. Compl. ¶ 31. According to plaintiff, the hate crime charge was unwarranted, as there was "absolutely no evidence that Ponsetto was motivated by race, or said anything racial." *Id.* However, Ponsetto was arraigned on the hate crime in June 2021 – five months before Bragg was elected. *See* https://nypost.com/2021/06/30/soho-karen-miya-ponsetto-pleads-not-guilty-to-felony-hate-crime/. After DA Bragg took office, Ponsetto negotiated a "sweetheart deal," under which she served no jail time and was permitted to replead to a simple misdemeanor after two years of good behavior. *See* https://nypost.com/2022/04/11/soho-karen-pleads-guilty-to-hate-crime-in-no-jail-deal/. According to press reports, Ponsetto exercised that option on June 2, 2024, thereby wiping the hate crime conviction from her record. *See* https://nypost.com/2024/06/03/us-news/soho-karen-gets-hate-crime-charge-erased-after-accusing-black-teen-of-stealing-cellphone-in-viral-video/.

## 2.    Discriminatory Purpose

Not only has plaintiff failed to plead that he was treated differently from similarly situated criminal suspects or defendants outside of his protected class; he has failed to allege any facts suggesting that the individual defendants from whom he seeks damages – ranging from the elected District Attorney to the NYPD patrol officers who responded to the scene of the homicide – personally and purposefully arrested him, incarcerated him, or prosecuted him "because he is not Black." Am. Compl. ¶ 2.

As to DA Bragg, the well-pleaded facts set forth in the Amended Complaint (together with the websites and news stories hyperlinked in its footnotes) show that he campaigned against "racial disparities in the criminal justice system," Am. Compl. ¶¶ 22-23; pledged to deliver "one standard of justice for all," *id.* ¶ 23 & n.12; de-prioritized "low-level offenses" and "crimes of poverty," *id.* ¶ 24; and said he would not "prosecute most petty offenses through the criminal court system," because "[t]he punishments are disproportionately harsh, and fall disproportionately on the backs of people of color." *Id.* ¶ 25. From these facts, plaintiff leaps to the conclusion that the DANY "provide[s] preferential treatment to criminal defendants who are Black or African-American over other races and ethnicities," Am. Compl. ¶ 2, and further speculates "this was one of the proximate causes of the actions taken against Plaintiff" in July 2022. *Id.* ¶ 26.[31] Since no plausible reading of the "factual matter" contained in the Amended Complaint supports that conclusion, it is "not entitled to the presumption of truth." *Iqbal*, 556 U.S. at 678-79. Consequently, plaintiff has failed to plead that DA Bragg harbored any improper racial animus.

---

[31] In his opposition brief, plaintiff goes even farther, arguing that the Court can infer, from DA Bragg's campaign speeches and Day One Memo, that there is an "unlawful quota system" at the DANY, and that its practices include "overcharging and railroading non-Black defendants so there is parity between Blacks and non-Blacks charged with felonies, and undercharging Black defendants so they are charged only with misdemeanors." Pl. Mem. at 21, 39.

He has also failed to plead that DA Bragg was "personally involved" in plaintiff's arrest on Friday night, July 1, 2022 or his arraignment on Saturday, July 2, 2022.[32] To "establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). This requires the plaintiff to "plead and prove that 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). There are no facts in the Amended Complaint suggesting that DA Bragg was aware of plaintiff's arrest on Friday night, July 1, 2022, much less that he played any part in it. Further, plaintiff's allegation that Detective Garcia "[w]ork[ed] with DA Bragg and [unspecified] high level officials in DANY" (presumably in the wee hours of Saturday morning) to "misrepresent[] the video of the incident," Am. Compl. ¶ 49, is transparently speculative,[33] and therefore insufficient to plead DA Bragg's personal involvement in the preparation of the Criminal Complaint. *See Leneau*, 2018 WL 566456, at *15 ("[C]omplaints that rely on 'group pleading' and 'fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim.'") *(quoting Adamou v. Cty. of Spotsylvania, Va.*, 2016 WL 1064608, at *11 (S.D.N.Y. Mar. 14, 2016)); *Paige-Bey v. City of New York*, 2016 WL 7217197, at *6 (E.D.N.Y. Dec. 12, 2016) ("threadbare recitals" were insufficient to state a claim against former Brooklyn

---

[32] Plaintiff has adequately pleaded that DA Bragg was involved in the decision to drop the charges on July 19, 2022. *See* Am. Compl. at 24 (second ¶ 56) & n.30. If plaintiff suffered any constitutional injury, however, it flowed from his arrest, prosecution, and detention, not from the dismissal of his case eighteen days later.

[33] In his opposition brief, plaintiff concedes that he has no evidentiary basis for the allegations in ¶ 49, stating, "Discovery will reveal whether Bragg was also involved in the drafting of the false Criminal Complaint." Pl. Mem. at 30.

County District Attorney where plaintiff failed to allege "facts demonstrating that former District Attorney Hynes . . . participated in or plausibly knew of any violation of his rights").

With respect to the NYPD detectives and officers named in Claims 4 and 8, plaintiff alleges even less. As in *Durham*, he "points to no discriminatory policy of the New York Police Department or the City of New York." 2019 WL 1316472, at *4. Nor does he plead any other facts "that could lead one to conclude that a discriminatory purpose motivated the Officers in this case." *Id*. None of the detectives and officers who responded to the scene are alleged to have made any racially-charged remarks or engaged in any conduct that would suggest that plaintiff was arrested because of his race (rather than because he had just killed Simon with a knife). Moreover, nothing in plaintiff's briefs suggests that he could cure this deficit if given leave to amend.

"[C]laims of race-based discrimination under the Equal Protection Clause and 42 U.S.C. § 1981 . . . require that intentional discrimination be alleged in a non-conclusory fashion." *Clyburn v. Shields*, 33 F. App'x 552, 555 (2d Cir. 2002). Here, instead of facts raising a plausible inference of intentional discrimination, plaintiff offers "naked allegations[s] that the defendant[s] acted based on plaintiff's race," *Bentley*, 599 F. App'x at 396, backed only by his "personal opinion that [his] treatment was motivated by discriminatory intent," which is "insufficient to state an equal protection claim." *Harris*, 2016 WL 3023265, at *6 (collecting cases). *See* Am. Compl. ¶ 2 (plaintiff was "arrested, incarcerated, and wrongfully prosecuted because he is not Black"); *id*. ¶ 19 (plaintiff was "discriminated against . . . because he is not Black"); *id*. ¶ 91 (plaintiff was "selectively prosecut[ed] because of his race"). Plaintiff has therefore failed to satisfy the second prong of his Equal Protection and Title VI claims.

### 3.    Intended Beneficiary

Plaintiff's Title VI claim fails, along with his Equal Protection claim, because he has not plausibly alleged either that he was treated "differently" on account of his race, *Freckleton*, 2023

WL 2648827, at *7, or that he was the victim of "intentional discrimination." *Idlibi*, 2024 WL 3199522, at *4. Moreover, a Title VI claim can only be asserted against "the entity that receives federal financial assistance, not an individual." *Kelly v. Rice*, 375 F. Supp. 2d 203, 208 (S.D.N.Y. 2005. Thus, plaintiff cannot maintain a Title VI suit against DA Bragg, either in his personal capacity, *see Goonewardena v. New York*, 475 F. Supp. 2d 310, 328 (S.D.N.Y. 2007) ("Title VI claims cannot be asserted against an individual defendant because the individual is not the recipient of federal funding."), or in his official capacity. *See TC v. Valley Cent. School Dist.*, 777 F.Supp.2d 577, 594 (S.D.N.Y. 2011) ("[N]o claim may be maintained against an individual under Title VI even in his official capacity.").

As against the City, plaintiff's Title VI claim fails for the additional reason that he has not alleged that he is the intended beneficiary of any program for which the City received federal funds. Plaintiff alleges generally that "[d]efendants are recipients of federal funds." Am. Compl. ¶ 107. However, he does not allege that he was an intended beneficiary of those federal funds. "This is absolutely fatal to [his] Title VI claim, since a plaintiff must allege that she was the intended beneficiary of a specific program or activity for which the [defendant entity] was receiving federal financial assistance." *Kelly*, 375 F. Supp. 2d at 209 (citing 42 U.S.C. §2000d).[34] Although the Second Circuit has not spoken on this issue, the clear consensus – in this district – is that a Title VI plaintiff must show both that the defendant received federal funds and that the plaintiff was an intended or entitled beneficiary of those funds. *See*, *e.g*., *Do No Harm v. Pfizer Inc.*, 646 F. Supp. 3d 490, 512 (S.D.N.Y. 2022), *aff'd,* 96 F.4th 106 (2d Cir. 2024); *Freckleton*,

---

[34] In *Kelly*, the plaintiff alleged that she had a valid handicapped parking tag but was wrongfully issued a parking ticket by a Westchester County police officer due to her race. The court dismissed the Title VI claim because "plaintiff has not alleged that Westchester County is receiving federal funds in connection with any program to provide handicapped parking facilities." 375 F. Supp. 2d at 209.

2023 WL 2648827, at *7; *Greene v. Sampson*, 2021 WL 355477, at *4 n.6 (S.D.N.Y. Feb. 2, 2021); *Milione v. City Univ. of New York*, 950 F. Supp. 2d 704, 709 (S.D.N.Y. 2013), *aff'd,* 567 F. App'x 38 (2d Cir. 2014); *Babiker*, 2000 WL 666342, at *4.[35] As the court explained in *Commodari v. Long Island University,* 89 F.Supp.2d 353, 377-78 (E.D.N.Y. 2000), "plaintiff must allege a 'logical nexus' between a federally funded program or activity and the . . . discrimination he allegedly suffered." Because plaintiff Alba has not alleged the required nexus, Claim 8 should be dismissed.

### D.    Plaintiff Fails to State a Claim for Illegal Seizure, False Arrest, or Malicious Prosecution

Plaintiff seeks damages for illegal seizure, false arrest, and malicious prosecution pursuant to § 1983 in the following claims:

- Claim 1, for illegal seizure in violation of the Fourth and Fourteenth Amendments, Am. Compl. ¶¶ 77-80;

- Claim 2, for false arrest in violation of the Fourth and Fourteenth Amendments, *id*. ¶¶ 81-85; and

- Claim 3, for malicious prosecution in violation of the Fourth and Fourteenth Amendments, *id.* ¶¶ 86-69.

Additionally, he seeks damages for the same alleged misconduct under state law in Claim 11 (for "illegal seizure & vicarious liability"), Am. Compl. ¶¶ 122-26; Claim 12 (for "false arrest and imprisonment & vicarious liability"), *id*. ¶¶ 127-31; Claim 13 (for "assault, battery, & vicarious liability"), *id*. ¶¶ 132-35; and Claim 14 (for "malicious prosecution & vicarious liability"). *Id.* ¶¶ 136-40. Plaintiff's claims for illegal seizure, assault and battery, and false arrest run against the

---

[35] Elsewhere in the Second Circuit, there is less consensus. *See*, *e.g*., *Alexander v. Hunt*, 2018 WL 3801240, at *7-9 (D. Vt. Aug. 9, 2018) ("Title VI plaintiffs need not allege that they are intended beneficiaries of any federally funded project in order to establish Title VI standing[.]").

Detective and Police Officer Defendants; his claims for malicious prosecution are asserted against the Detective, Police Officer, and District Attorney Defendants.

"A fourth amendment 'seizure' occurs when police detain an individual under circumstances in which a reasonable person would believe he or she is not 'free to leave.'" *Johnson v. City of Newburgh*, 690 F. Supp. 3d 224, 235 (S.D.N.Y. 2023) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)), *reargument denied sub nom. Johnson v. Geraci*, 2023 WL 5836683 (S.D.N.Y. Sept. 8, 2023). Here, plaintiff was detained at the Blue Moon when he was arrested. Am. Compl. ¶ 45. He does not allege any other or different "seizure." Claim 1 (for illegal seizure) is therefore subsumed within, and may be analyzed together with, Claim 2 (for false arrest), which likewise "derives from his Fourth Amendment right to remain free from unreasonable seizures[.]" *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). *See Lozada v. Weilminster*, 92 F. Supp. 3d 76, 98 (E.D.N.Y. 2015) ("Because Plaintiff does not allege a search or seizure beyond the actions supporting her false arrest claim, Plaintiff's unlawful seizure claim is subsumed by her other Fourth Amendment claims."); *Parkinson v. Town of Niskayuna*, 2023 WL 8574309, at *4 (N.D.N.Y. Dec. 11, 2023) (dismissing plaintiff's claim for "seizure of his person" as duplicative of his claim for false arrest where he alleged no facts "to differentiate the circumstances of his seizure from those of his arrest").

To prevail on a claim for false arrest under § 1983, the plaintiff must show: "that (1) 'the officer intended to confine the plaintiff,' (2) 'the plaintiff was conscious of the confinement and did not consent to it,' and (3) 'the confinement was not otherwise privileged,' such as whether it was supported by 'probable cause to arrest.'" *Dorsey v. Gannon*, 2024 WL 1338772, at *1 (2d Cir. Mar. 29, 2024) (summary order) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996)). The elements of a false arrest claim under New York law are "substantially the same."

*Harrison v. Cnty. of Nassau*, 804 F. App'x 24, 26-27 (2d Cir. 2020) (summary order); *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003). "Therefore, the analysis of the state and the federal claims is identical," *Boyd*, 336 F.3d at 75, and the "pivotal issue" in many cases – including this one – is probable cause. *Id*. Probable cause is a "complete defense" to a false arrest claim, whether brought under § 1983 or New York law. *Harrison*, 804 F. App'x at 27.

Plaintiff's state law claim for assault and battery also turns on the issue of probable cause, because he does not allege any assault or battery apart from his arrest, *see* Am. Compl. ¶ 132, and does not contend that any excessive force was used. *Id*. "A lawful arrest is not an assault or battery under New York law, provided the force used is reasonable." *Figueroa v. Mazza*, 825 F.3d 89, 105 n.13 (2d Cir. 2016); *see also Serrano v. City of New York*, 2018 WL 3392869, at *11 (S.D.N.Y. July 12, 2018) ("The law is clear that 'where there has been a lawful arrest, intentional contact with the arrested person does not constitute assault and battery, provided such force is reasonable.'") (quoting *Leibovitz v. City of New York*, 2016 WL 3671232, at *8 (S.D.N.Y. Mar. 17, 2016)), *aff'd*, 793 F. App'x 29 (2d Cir. 2019). Consequently, the existence of probable cause to arrest, which is a complete defense to plaintiff's false arrest claims, is also a complete defense to his state law assault and battery claim.

A claim for malicious prosecution under § 1983 requires the plaintiff to show: "(1) 'the initiation or continuation of a criminal proceeding against [the] plaintiff,' (2) the 'termination of the proceeding in [the] plaintiff's favor,' (3) 'lack of probable cause for commencing the proceeding,' and (4) 'actual malice as a motivation for [the] defendant's actions.'" *Dorsey*, 2024 WL 1338772, at *1 (quoting *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010)) (alterations in original). The elements of a malicious prosecution claim under New York law are "substantially the same." *Lanning*, 908 F.3d at 25; *Boyd*, 336 F.3d at 75. Thus, once again, "the

existence of probable cause is a 'complete defense' to the cause of action." *Dorsey*, 2024 WL 13387732, at *1 (quoting *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014)); *accord Norales*, 2022 WL 17958450, at *3.

After careful review of the well-pleaded factual allegations contained in the Amended Complaint, together with the Store Videos, other documents incorporated into or integral to the pleading, and matters of which judicial notice can be taken, I conclude that plaintiff has failed to allege facts showing that defendants lacked probable cause to arrest him at the scene of the stabbing or lacked probable cause to charge him with a crime the next day. I further conclude that, at a minimum, defendants acted with "arguable probable cause," entitling them to a dismissal of these claims on qualified immunity grounds.[36]

### 1.    Probable Cause to Arrest

Probable cause to arrest exists when an officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996). "As the Supreme Court has noted, probable cause is not an especially 'high bar.'" *Dorsey*, 2024 WL 1338772 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). "By definition, only the 'probability' of criminal conduct must be shown – certainty is not required." *Hardy v. Baird*, 2016 WL 2745852, at *9 (S.D.N.Y. May 10, 2016)

---

[36] It bears repeating here that once a court has determined that it is entitled to consider a video in connection with a pleading motion, it "views the allegations of the complaint as true only 'to the extent that they are not contradicted by [the] video evidence.'" *Kass*, 864 F.3d at 205 (quoting *Garcia*, 779 F.3d at 88). In both *Kass* and *Garcia*, the Court of Appeals relied on the video evidence to determine, pursuant to Rule 12(c), that there was arguable probable cause to arrest. In *Norales v. Acevedo*, 2021 WL 739111 (S.D.N.Y. Feb. 24, 2021), *aff'd,* 2022 WL 17958450 (2d Cir. Dec. 27, 2022), the district court relied on a video (incorporated by reference into the complaint) to dismiss plaintiff's false arrest and malicious prosecution claims pursuant to Rule 12(b)(6) on the ground that "probable cause existed" for his arrest and prosecution. *Id*. at *6-7.

(citing *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). The fact that an arrestee "is later acquitted of the offense for which he is arrested," *id.*, or that "the charges were dropped," does not "in any way alter the conclusion that [the officer] had probable cause to effect the arrest." *Cortes v. City of New York*, 148 F. Supp. 3d 248, 254 (E.D.N.Y. 2015).

In considering whether an officer had probable cause to arrest, the court must "look to 'the totality of the circumstances,'" *Guillen*, 625 F. Supp. 3d at 150 (quoting *Manganiello*, 612 F.3d at 161, focusing on the facts that were "available to the arresting officer at the time of the arrest and immediately before it." *Id.* (quoting *Scott v. City of New York*, 2022 WL 846929, at *2 (S.D.N.Y. Mar. 22, 2022)). Although an arresting officer may not "deliberately disregard facts known to him which establish justification," *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003), he has no duty to "investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest." *Id.* at 135-36; *see also Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (officer had probable cause to arrest Ricciuti after "a visibly injured Harlice Watson" approached him, produced a corrections officer badge, and stated that Ricciuti had attacked him "without provocation" – even though Ricciuti "protested that Watson had started the fight"). Needless to say, the existence of a potential exculpatory defense that is unknown to the arresting officer does not vitiate probable cause. *Jocks*, 316 F.3d at 135 ("probable cause may exist where the police do not know of the existence or validity of an exculpatory defense.").

Here, plaintiff argues that defendants "lacked probable cause to arrest plaintiff for murder," Pl. Mem. at 9, because "they ignored an exculpatory video showing plaintiff defending himself, and did not take statements from witnesses who observed that plaintiff acted in self-defense[.]" *Id.* (citing Am. Compl. ¶ 65). However, plaintiff does *not* allege that when he was handcuffed in the

Blue Moon at 11:11 p.m. (about two minutes after the first NYPD officers arrived), any of the officers on site had seen the security footage, or even knew it existed. Moreover, an arrest is valid if probable cause "existed to arrest for *any* crime," *Marcavage v. City of New York*, 689 F.3d 98, 109 (2d Cir. 2012) (emphasis added), whether or not that crime was ultimately charged. Thus, "a claim for false arrest turns only on whether probable cause existed to arrest a defendant[.]" *Jaegly*, 439 F.3d at 154. "[I]t is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Id.*

In New York, a person is guilty of murder in the second degree if, "[w]ith intent to cause the death of another person," he causes the death of that person. PL § 125.25(1). A person is guilty of manslaughter in the first degree if he causes the death of another person "with intent to cause serious physical injury" to that person. PL § 125.20(1). A person is guilty of assault in the first degree if "[w]ith intent to cause serious physical injury to another person, he causes such injury . . . by means of a deadly weapon or a dangerous instrument." PL § 120.10(1). A person is guilty of criminal possession of a weapon in the fourth degree if he "possesses any . . . dangerous knife . . . with intent to use the same unlawfully against another." PL § 265.01(2).

When the NYPD arrived at the Blue Moon on July 1, 2022, the responding officers found Simon on the floor, dead or dying from multiple stab wounds, and Alba behind the counter, with blood on his hands and arms and the bloody knife he used to kill Simon at his feet. *See* Store Videos (Exs. A-4, A-5, A-9). They also found Grady, crouched near Simon's body. *Id.* (Exs. A, A-1, A-4.) She immediately identified Alba as the perpetrator, *id.*, which he did not deny. There was no evidence at the scene that Simon ever used or brandished a weapon. Moreover, there is no allegation in the Amended Complaint, and no suggestion in the Store Videos, that plaintiff (or anyone else) *told* the officers on scene that he was threatened with a weapon, feared for his life, or

otherwise "reasonably believed" that Simon "[was] using or [was] about to use deadly physical force," PL § 35.15(2)(a), which could support the exculpatory defense of justification.[37] *Cf. Jocks* (the off-duty police officer who arrested Jocks for throwing a phone handset at him *knew* that Jocks "could have been acting under a threat of 'imminent physical force,'" because, according to Jocks, the officer himself had just "pulled his gun and threatened Jocks with it"). Thus, unlike in *Jocks* and *Ricciuti*, there was no "claim of innocence" for the arresting officers to consider, *Ricciuti*, 124 F.3d at 128, when they took plaintiff into custody. Moreover, as noted above, plaintiff does not allege that any NYPD officer knew, in those first chaotic minutes, that the store's security cameras had recorded the stabbing.

"Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti*, 124 F.3d at 128. It is irrelevant, at that point, that "an investigation might have cast doubt upon the basis for the arrest." *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001). Here, given the evidence that confronted the responding officers at the scene, they were under no obligation to interview multiple witnesses or hunt for store security footage in order to determine whether there *might* be a plausible claim of self-defense. *See Harig v. City of Buffalo*, 574 F.Supp.3d 163, 195 (W.D.N.Y. 2021) (officers were not required to investigate every potential claim of innocence before making an arrest, especially when "confronted with a chaotic scene," "presented with conflicting accounts of a life-threatening assault," and "sorting through the varying

---

[37] As discussed in more detail in Part II(D)(2), *infra*, a person may not use "deadly physical force" against another, even if the other person was the "aggressor," unless the actor reasonably believed that the aggressor was using or was about to use "deadly physical force." PL § 35.15(2)(a); *see also People v. Goetz*, 68 N.Y.2d 96, 115, 497 N.E.2d 41, 52 (1986) (at trial, when presented with a justification defense, the jury must first determine "whether [the defendant] believed deadly force was necessary to avert the imminent use of deadly force," and, if so, "whether these beliefs were reasonable").

accounts provided by uncooperative witnesses who may have themselves participated in the crime"), *aff'd*, 2023 WL 3579367 (2d Cir. May 22, 2023). Even if the officers on the scene lacked probable cause to believe that plaintiff committed murder, there was ample probable cause to believe he intended to "cause serious physical injury" to Simon, *see* PL §§ 125.20(1), 120.10(1), or possessed a "dangerous weapon" with the intent to use it unlawfully. *See* PL § 265.01(2).

Because plaintiff has not alleged – and cannot allege – that defendants lacked probable cause to arrest him at the scene, Claims 1, 2, 11, 12, and 13 should be dismissed with prejudice.

### 2.    Probable Cause to Prosecute

At the prosecution stage, probable cause must exist for "each charge brought against the plaintiff." *Klein v. Zugabie*, 2017 WL 374733, at *9 n.16 (S.D.N.Y. Jan. 24, 2017). Further, the determination of probable cause to prosecute "is assessed in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of the arrest." *Bertuglia v. City of New York*, 133 F. Supp. 3d 608, 632 (S.D.N.Y. 2015), *aff'd sub nom. Bertuglia v. Schaffler*, 672 F. App'x 96 (2d Cir. 2016). However, "to sustain a malicious prosecution claim where probable cause existed to make the arrest, a plaintiff must show that defendants learned of intervening facts between the arrest and the initiation of the prosecution that undermined the initial probable cause determination." *Lora v. City of New York*, 2016 WL 4074433, at *7 (S.D.N.Y. July 29, 2016); *see also Lowth*, 82 F.3d at 571 ("In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact."); *Nzegwu v. Friedman*, 605 F. App'x 27, 31 (2d Cir. 2015) (same).

It is irrelevant to a malicious prosecution claim (just as it is to a false arrest claim) that the charges were later dropped. *See*, *e.g.*, *Dorsey*, 2024 WL 1338772, at *2 (although the charges against plaintiff were later dismissed, defendant "cleared – by a good margin – the low bar needed to establish continuing probable cause and defeat Dorsey's claims for false arrest and malicious

prosecution"). Thus, plaintiff's contention that the DANY's decision to dismiss the case establishes a lack of probable cause to initiate the case at the outset, *see* Pl. Mem. at 33, "confuses the proof required to establish probable cause with that required to sustain a guilty verdict at trial." *United States v. Coiscou*, 793 F. Supp. 2d 680, 685 (S.D.N.Y. 2011); *see also Rao v. City of New York*, 2018 WL 1582289, at *5 (E.D.N.Y. Mar. 29, 2018) (rejecting argument that ADA's decision not to indict vitiated probable cause, because "the likelihood of proving guilt beyond a reasonable doubt is not relevant" to the probable cause question).

Plaintiff's alternative theory rests on the fact that, by the time the Criminal Complaint was filed, NYPD personnel had reviewed the key portions of the Store Videos and interrogated both Alba (whose statement was largely consistent with the Store Videos, *see* Am. Compl. ¶ 47), and Grady (who was not forthcoming about her own conduct, but did not provide any new information as to the interaction between plaintiff and Simon). In plaintiff's view, the video footage was so thoroughly "exculpatory" that it "conclusively demonstrated that plaintiff had acted in self-defense," *id*. ¶ 6, thereby negating probable cause for the murder charge. *See also* Pl. Mem. at 15 (the video "conclusively establish[ed] self-defense or justification").

I disagree. The video clearly shows – and plaintiff confirmed, at the 30th Precinct – that Simon had no visible weapon; that he shoved plaintiff once, and was "yelling loudly," but "didn't actually hit [plaintiff]"; and that plaintiff resorted to deadly force, grabbing the knife and stabbing Simon repeatedly, when Simon was holding the collar of plaintiff's shirt "to take me to her, to make me say, 'I'm sorry.'" Store Videos (A, A-1, A-4, A-9); Alba Int. Video at 6:01-02; Alba Int. Tr. at 8-10. Moreover, at no point during his interrogation did plaintiff make any statement to the effect that he feared for his life or was trying to prevent a robbery. These facts, under New York law, likely would *not* support a justification defense.

The defense of "justification" (commonly known as self-defense) "permits the use of force under certain circumstances." *Matter of Y.K.*, 87 N.Y.2d 430, 433, 663 N.E.2d 313, 314 (1996). The degree of force permitted "is related to the degree of force reasonably believed necessary to repel various threats." *Id*. For example, an actor may "use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person[.]" PL § 35.15(1). "Deadly force," however, may be used only when the actor "reasonably believes that such other person is using or about to use deadly physical force." *Id*. § 35.15(2)(a). Thus, the mere fact that Simon was the "aggressor" (which was clear from the Store Videos) did not justify plaintiff in the use of "deadly" force in return.

The standard set forth in § 35.15(2) "contains both subjective and objective elements." *United States v. Watson*, 2022 WL 17660546, at *4 (2d Cir. Dec. 14, 2022) (summary order); *see also Goetz*, 68 N.Y.2d at 115, 497 N.E.2d at 52. Here, as noted above, plaintiff did not make any statement suggesting that he subjectively believed that Simon was about to use deadly force on him. Moreover, while every case turns on its own facts, "[a] number of New York courts have held that where a victim was unarmed, no reasonable defendant could have believed that [the defendant] was in imminent danger of the use of deadly physical force." *Steele v. Laclaire*, 2007 WL 2982240, at *6, *8 (S.D.N.Y. Oct. 10, 2007) (collecting cases).[38] Having actually reviewed the Store Videos,

---

[38] In *Steele*, the court held, on *habeas* review from a conviction for assault and criminal possession of a weapon, that petitioner was not entitled to raise a justification defense at trial because he used a knife, which constitutes "deadly physical force as a matter of law," against an unarmed man, after a minor traffic accident sparked an episode of "'grabbing,' 'tussling' with and 'punching' each other"). 2007 WL 2982240, at *2. In *People v. Krebs*, 11 A.D.3d 713, 713, 784 N.Y.S.2d 564, 565 (2d Dep't 2004), the Appellate Division held, on direct review from a manslaughter verdict, that the defendant was not entitled to a justification charge where he "stabbed the victim in the neck, when the victim was unarmed, and the defendant had no reason to believe that the victim was carrying a weapon or was about to use deadly physical force against him"). And in *People v.*

I reject plaintiff's legal conclusion – that they "conclusively demonstrated that Plaintiff had acted in self-defense," Am. Compl. ¶ 6 – and recommend that Claims 3 and 14, for malicious prosecution, be dismissed because plaintiff has not alleged that defendants lacked probable cause to charge him with murder in the second degree on July 2, 2022.[39]

### 3.    Arguable Probable Cause

"The doctrine of qualified immunity shields government employees acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their conduct violated clearly established rights of which an objectively reasonable official would have known." *Lowth*, 82 F.3d at 568-69. An officer is entitled to qualified immunity if either (i) "his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"; or (ii) "it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act. " *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001) (internal citations omitted). In false arrest and malicious prosecution claims, "an officer's probable cause determination is 'objectively reasonable' provided there was 'arguable' probable cause." *Arrington v. City of New York*, 628 F. App'x 46, 49 (2d Cir. 2015) (summary order) (quoting *Jenkins v. City of N.Y.,* 478 F.3d 76, 87 (2d Cir. 2007)). "Arguable probable cause [to arrest] exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Zalaski v.*

---

*Irizarry*, 200 A.D.3d 428, 429, 157 N.Y.S.3d 287, 288-89 (1st Dep't 2021), on appeal from an assault conviction, the court held that the defendant was not entitled to a justification charge because the video evidence showed that he stabbed his victim "in response to the complainant's punch," thereby responding to "ordinary force" with "deadly force."

[39] Because there was probable cause (or arguable probable cause, *see* Part II(D)(3), *infra*) to charge plaintiff with murder, the Court need not reach the City Defendants' alternative argument that, regardless of the presence or absence of probable cause, the exercise of independent judgment by prosecutors "sever[ed] causation," such that no NYPD detective or officer can be liable for malicious prosecution. City Mem. at 15-16.

*City of Hartford,* 723 F.3d 382, 390 (2d Cir. 2013) (internal quotation marks omitted). Arguable probable cause to charge exists where, accounting for any new information learned subsequent to an arrest, "it was not manifestly unreasonable for [the defendant officer] to charge [the plaintiff]." *Lowth*, 82 F.3d at 572; *accord Arrington*, 628 F. App'x at 49.

In this case, defendants clearly had – at a minimum – arguable probable cause to arrest plaintiff on July 1 and charge him with murder in the second degree on July 2, 2022. The undisputed fact of the killing itself, in the absence of a self-defense claim, "would clearly establish probable cause." *Arrington*, 628 F. App'x at 49. As a matter of law, "[t]he extent to which a police officer must credit a self-defense claim in establishing probable cause is not clearly established, and depends on the facts and circumstances of each arrest." *Id*. Thus, even if plaintiff had made such a claim at the scene (which he does not allege), the decision to arrest him was, as a matter of law, "not unreasonable." *See id*. (holding that it was "not unreasonable" to arrest the plaintiff after he "admitted to shooting someone" but claimed he did so in self-defense).

Similarly, the extent to which a defendant may assert a successful justification defense after using deadly force on a single, unarmed assailant is not clearly established. To the contrary: the New York courts have frequently ruled that, in such cases, the defendant is not even entitled to a justification charge at trial. *See Steele*, 2007 WL 2982240, at *8; *Krebs*, 11 A.D.3d at 713, 784 N.Y.S.2d at 565; *Irizarry*, 200 A.D.3d at 429, 157 N.Y.S.3d at 288. After Detective Garcia reviewed the Store Videos, therefore, and attended the interrogations of Alba and Grady, "it was not manifestly unreasonable for [him] to charge [Alba]" under PL § 125.25(1). *Lowth*, 82 F.3d at 572. At a minimum, "officers of reasonable competence could disagree on whether the probable cause test was met." *Zalaski,* 723 F.3d at 390. In the alternative, therefore, Claims 1-3 and 11-14 should be dismissed on qualified immunity grounds.

### 4.    Group Pleading

False arrest and malicious prosecution claims brought pursuant to § 1983 require the plaintiff to plead each named defendant's direct and personal involvement in the constitutional tort. *See Grullon*, 720 F.3d at 138 (plaintiffs' "group pleading" failed to directly connect four officer defendants to the allegedly unlawful arrests, and failed to satisfy the requirement that a plaintiff must demonstrate a defendant's personal involvement in order to hold a defendant responsible for a constitutional deprivation). Here, plaintiff seeks damages on his false arrest and malicious prosecution claims from all seven NYPD detective and officers who responded to the scene (and, on the malicious prosecution claims, from DA Bragg as well). However, only Detective Garcia is listed as the arresting officer, *see* Arrest Rep. at 3, and only Detective Garcia signed the Criminal Complaint. Am. Compl. ¶ 49. As to the remaining NYPD personnel, plaintiff fails to allege what each of them did to arrest plaintiff on July 1, 2022, or to prosecute him the following day, and consequently fails to state any claim against them. *See Grullon*, 720 F.3d at 138; *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 598-99 (E.D.N.Y. 2017) (dismissing false arrest and malicious prosecution claims against five officers who, insofar as the complaint demonstrated, did not have "even a minimal role in arresting, investigating, or prosecuting" the plaintiff). The same is true as to DA Bragg, for the reasons explained in Part (II)(C)(2), *supra*. Consequently, even if the Amended Complaint adequately alleged that plaintiff was arrested and charged without probable cause, Claims 1-3 and 11-14 should be dismissed as to all individual defendants other than Detective Garcia.

### E.    Plaintiff Fails to State a Fair Trial Claim

In Claim 5, plaintiff alleges that the Detective, Police Officer, and District Attorney Defendants violated his right to a fair trial by "conveying false information and withholding exculpatory information, including *Brady* material, in order to have Plaintiff prosecuted for murder

and incarcerated." Am. Compl. ¶¶ 94-97. Plaintiff's theory is that the Criminal Complaint, signed by Detective Garcia, "misrepresented the video of the incident" and "put forth a false narrative," which "made plaintiff appear culpable" and "minimized Simon's conduct[.]" *Id*. ¶¶ 49-50; *see also* Pl. Mem. at 36 (defendants "fabricat[ed] evidence by mischaracterizing the video and withholding the exculpatory evidence contained in the video").

Insofar as Claim 5 is asserted against DA Bragg, it should be dismissed on prosecutorial immunity grounds. *See* Part II(B), *supra*. As to the remaining defendants, Claim 5 should be dismissed because plaintiff has not plausibly alleged that Detective Garcia (or anyone else) fabricated evidence. Nor has he identified any evidence that was withheld from him.

### 1.    False Information

To succeed on a claim for denial of the right to a fair trial based on fabrication of evidence, a plaintiff must plead, among other things, that "the officer created false information, the officer forwarded the false information to prosecutors, and the false information was likely to influence a jury's decision." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016); *accord Barnes v. City of New York*, 68 F.4th 123, 128 (2d Cir. 2023). The fabricated evidence may include a police officer's false statement about an invented confession, *see Ricciuti*, 124 F.3d at 129, or the officer's "own account of his or her observations of alleged criminal activity," if that account is false. *Garnett*, 838 F.3d at 274. A fair trial claim based on fabrication of evidence may proceed even if there was probable cause to arrest. *Id*. at 277-78; *Hincapie v. City of New York*, 434 F. Supp. 3d 61, 75 (S.D.N.Y. 2020). To defeat a motion to dismiss, however, the plaintiff must "present more than conclusory allegations that the officers fabricated [their] account." *Barnes*, 68 F. 4th at 129.

Here, plaintiff alleges that the "false information" was contained in the Criminal Complaint, signed by Detective Garcia, which described the relevant surveillance video footage as follows:

> At approximately 11:05 PM, Mr. Simon entered the area behind the counter. Mr. Simon was carrying a small white towel in his left hand and his right hand was empty. Mr. Simon pushed the defendant once and spoke to him while the defendant sat in a chair behind the counter. Mr. Simon then put the towel in his pocket and attempted to steer the defendant out of the area behind the counter, but the defendant picked up a kitchen knife that was stashed behind the counter and stabbed Mr. Simon in the neck and chest at least five times. Informant [Tina Lee] attempted to pull the defendant away from Mr. Simon and held the defendant's right arm but the defendant continued to stab Mr. Simon. Informant then took a knife from her purse and stabbed the defendant's arm. Mr. Simon fell to the ground, face-down and bleeding.

Am. Compl. ¶ 49 (alteration in original); Crim. Compl. at 1.

Plaintiff repeatedly describes this passage as a "false narrative," *see* Am. Compl. ¶¶ 49, 50, but does not identify any actual falsehood within it. Nor could he. Every sentence accurately describes a portion of the events depicted in the Store Videos. *See* Part I(A)(3), *supra*. Since plaintiff cannot "point to anything in [the Criminal Complaint] that was false," *Jones v. City of New York*, 2014 WL 1427855, at *2 (E.D.N.Y. Apr. 14, 2014), he has failed to plausibly allege that Detective Garcia (or anyone else) forwarded "false information" to the DANY or presented it to the Criminal Court. *Id.*; s*ee also Amory v. Katz*, 2016 WL 7377091, at *9 (D. Conn. Dec. 19, 2016) (dismissing fabrication-of-evidence claim based on "conclusory statements that the officers' descriptions of events were 'false,'" without factual support); *Soto v. City of New York*, 132 F. Supp. 3d 424, 458 n.40 (E.D.N.Y. 2015) (plaintiff's "bald assertion" that defendants "fabricated . . . DD5s" was "insufficient to defeat Defendants' motion").[40]

---

[40] Plaintiff's real objection appears to be that Detective Garcia's choice of words or emphasis in the Criminal Complaint "minimized Simon's conduct." Am. Compl. ¶ 50. It is true that the Criminal Complaint used a more neutral tone, and fewer adjectives, than the Amended Complaint

### 2.  Withheld Exculpatory Evidence

To prevail on a *Brady* claim,[41] the plaintiff must satisfy three elements: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *accord Hincapie*, 434 F. Supp. 3d at 76. A *Brady* claim does not depend on what police officers or prosecutors *say* about the evidence; rather, it requires a showing that they *withheld* exculpatory evidence from the plaintiff, to his prejudice. *See United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) ("Evidence is not 'suppressed' if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence.") (citations omitted). Moreover, if the defendant is a police officer, "the scope of possible liability is necessarily more limited because police officers satisfy their obligation under *Brady* when they turn over exculpatory information to prosecutors, unless there is some indication that the police

---

now before this Court. *See*, *e.g*., Am. Compl. ¶ 40 (Simon was "an extremely menacing and enraged individual"); *id.* ¶ 42 (Simon spoke to plaintiff "in a threatening tone"); Pl. Mem. at 30 (arguing that the Criminal Complaint "downplayed Simon's aggression"). The Constitution, however, demands only that the evidence be described accurately, not that it be colored as the arrestee would prefer. *See Thorpe v. Duve*, 2020 WL 5763941, at *1, 5 (N.D.N.Y. Sept. 28, 2020) (police officer did not create false evidence by characterizing Thorpe as the "primary" user of a particular mobile phone, where Thorpe alleged that "what he actually said" was that "it was a 'community phone' that he personally used most often, not that the phone was primarily used by him"), *aff'd*, 2022 WL 332804 (2d Cir. Feb. 4, 2022); *Jovanovic v. City of New York*, 2010 WL 8500283, at *10 (S.D.N.Y. Sept. 28, 2010) ("A quibble over terminology does not constitute fabricated evidence or false information[.]"), *aff'd*, 486 F. App'x 149 (2d Cir. 2012); *Soto*, 132 F. Supp. 3d at 457-58 (police officer did not create "false evidence" by translating the Spanish slang term "tiguere," used in a text message received by plaintiff, as "bad dude" rather than "dude").

[41] *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment.")

have suppressed evidence." *Hincapie*, 434 F. Supp. 3d at 76 (quoting *McCaffrey v. City of New York,* 2013 WL 494025, at *12 (S.D.N.Y. Feb. 7, 2013)).

Here, the "exculpatory evidence" was the video footage itself. But plaintiff does not allege that defendants *withheld* the Store Videos from him. Nor does he allege that Detective Garcia, or any other police official, *withheld* them from the prosecutors. Rather, he claims that defendants "misrepresented" the contents of the videos in the Criminal Complaint. Am. Compl. ¶ 49. Consequently, plaintiff's *Brady* claim fails.

### 3.    Group Pleading

A fair trial claim, like any other claim brought pursuant to § 1983, requires the plaintiff to plead each defendant's direct and personal involvement in the constitutional tort. *Johnson*, 690 F. Supp. 3d at 238; *see also Jordan v. City of New York*, 2017 WL 3106453, at *4 (S.D.N.Y. July 17, 2017) (dismissing fabrication of evidence claim against all but two defendants because "Plaintiff does not allege that the other Officer Defendants fabricated evidence or took any part in forwarding evidence to the District Attorney's Office"). "[G]roup pleadings" are "insufficient" to state a fabrication of evidence claim against individual defendants "as to whom there are no specific allegations of involvement." *Ying Li*, 246 F. Supp. 3d at 629; *see also Rogers v. Bisono*, 2016 WL 4224072, at *2 (S.D.N.Y. Aug. 9, 2016) ("Generalized allegations against a group of defendants will not suffice[.]"). Moreover, as to supervisory defendants, "mere 'knowledge and acquiescence' cannot establish personal involvement under § 1983." *Gumora v. City of New York*, 2018 WL 736018, at *3 (S.D.N.Y. Feb. 5, 2018) (quoting *Iqbal*, 556 U.S. at 677).

Here, plaintiff seeks damages on his fair trial claim from every individual NYPD officer named in the Amended Complaint (and from DA Bragg), but fails to plead facts from which the personal involvement of any defendant other than Detective Garcia could be inferred. Instead, plaintiff speculates that Garcia acted "with the acquiescence of the other officers and detectives

who failed to intervene and who acted in concert with him," and that he "work[ed] in concert with DA Bragg and high-level officials in DANY" to "misrepresent[] the video of the incident." Am. Compl. ¶ 49. As discussed in Part II(C)(2), *supra*, this is insufficient under *Iqbal*. *See*, *e.g.*, *Rogers*, 2016 WL 4224072, at *2 (dismissing fabrication of evidence claims against defendant Peterkin where plaintiff's "generic" allegations that all three defendants were involved in depriving him of a fair trial were "not sufficient to survive a motion to dismiss with respect to an individual defendant"); *McHenry v. Bell*, 2015 WL 2354438, at *1, 11 (N.D.N.Y. May 15, 2015) (conclusory allegations that all defendants "conspired with one another to falsify and fabricate evidence" were insufficient to state a claim against individual defendants as to whom plaintiff "failed to allege facts plausibly suggesting that [they] were personally involved in the fabrication of evidence"); *Isaac v. City of New York*, 2018 WL 5020173, at *13 (E.D.N.Y. Aug. 6, 2018) (plaintiff's "formulaic" allegation that supervisors of defendant who signed criminal complaint "approved" the complaint, with knowledge that its contents were false, was insufficient to state a claim for fabrication of evidence against the supervisors), *adopted*, 2018 WL 4583481 (E.D.N.Y. Sept. 24, 2018). Consequently, even if plaintiff's fair trial claim against Detective Garcia were adequately pleaded, Claim 5 should be dismissed against all of the other defendants named therein.

### F.    Plaintiff Fails to State a Claim for Failure to Intervene

In Claim 7, plaintiff seeks damages from all of the individual defendants, pursuant to § 1983, for failing to intervene "to prevent the violations of Plaintiff's federal constitutional and statutory rights." Am. Compl. ¶ 103. Law enforcement officers owe a duty "to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Blue v. City of New York*, 2018 WL 2561023, at *11 (S.D.N.Y. June 4, 2018) (quoting *Anderson v. Branen*, 17 F. 3d 55, 557 (2d Cir. 1994)). However, if there is no "predicate violation of Plaintiff's constitutional rights," there can be no liability for failure to intervene. *Id.*; *see also*

*Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 566 (S.D.N.Y. 2010) ("An underlying constitutional violation is an essential element of a failure to intercede claim under § 1983.").

Insofar as Claim 7 is asserted against DA Bragg, it should be dismissed on prosecutorial immunity grounds. *See* Part II(B), *supra*. Alternatively, the claim should be dismissed as to all individual defendants because no predicate violations have been pled. *See* Parts II(C)-(E), *supra*.

Even where there is a predicate violation, "[l]iability only attaches if (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Bouche v. City of Mount Vernon*, 2012 WL 987592, at *5 (S.D.N.Y. Mar. 23, 2012) (quoting *Tavares v. City of New York*, 2010 WL 234974, at *4 (S.D.N.Y. Jan. 19, 2010)). The plaintiff must plead facts showing that these elements are satisfied as to *each* defendant who allegedly failed to intervene. *See Spence v. City of New York*, 2022 WL 4537946, at *6 (S.D.N.Y. Sept. 28, 2022) (dismissing failure-to-intervene claim because it was "reliant upon impermissible group pleading"); *Ojo v. United States*, 2019 WL 3852391, at *13 (E.D.N.Y. Aug. 15, 2019) (recommending dismissal of failure-to-intervene claims where the relevant portions of the complaint "include allegations against all defendants, rather than allegations specific to any individual defendant's role in the alleged constitutional violations," or simply alleges that "all defendants are responsible for certain conduct"), *adopted,* 2019 WL 4602823 (E.D.N.Y. Sept. 23, 2019); *Bouche*, 2012 WL 987592, at 7 (dismissing failure-to-intervene claim as "vague and conclusory" where plaintiff generally alleged that "[d]efendants had an affirmative duty to intervene" when plaintiff's rights "were being violated in their presence by other officers," but "never identif[ied] which defendants were responsible for specific actions").

Here, as in *Ojo*, the relevant portions of the Amended Complaint "include allegations against all defendants, rather than allegations specific to any individual defendant's role in the alleged constitutional violations." 2019 WL 3852391, at *13; *see, e.g.*, Am. Compl. ¶ 19 (alleging that all of the NYPD personnel who responded to the Blue Moon "fail[ed] to intervene to stop the unlawful arrest and prosecution"); *id*. ¶ 45 ("Even those officers and detectives who did not make the decision to arrest Plaintiff, these defendants failed to fulfill their constitutional obligation to intervene and inform NYPD supervisors and DANY that there was no cause to arrest and prosecute plaintiff for homicide."). In his opposition brief, plaintiff uses the same sweeping terms, asserting that all of the Detective and Police Officer Defendants (whether or not they saw the Store Videos, knew what the witnesses told their colleagues, attended the interrogations, or cast their eyes upon the Criminal Complaint) "are liable for failing to intervene because they knew that plaintiff had been arrested without probable cause, that there was an exculpatory video that was being mischaracterized, that exculpatory information in the video was being withheld, and that exculpatory information from witnesses was not gathered." Pl. Mem. at 46. These "conclusory, non-specific allegations, are plainly insufficient." *Ojo*, 2019 WL 3852391, at *13.

### G.    Claims 1-8 and 10-14 Should Be Dismissed Without Leave to Amend

While leave to amend should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), justice does not require that leave be granted where, as here, the plaintiff has already amended once (in response to defendants' initial motions to dismiss, which raised the same arguments now before the Court), and where his motion papers do not describe any new facts that, if pled, would render viable any of his federal claims. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (motions for leave to amend may properly be denied for "futility of amendment").

Plaintiff cannot replead his claims against DA Bragg (or, for that matter, assert similar claims against other DANY employees) because all of those claims are barred by the doctrine of

absolute prosecutorial immunity. He cannot replead his claims for race-based discrimination because he cannot show that he was treated more harshly than others "similarly situated" on account of being "not Black." He cannot replead his claims for illegal seizure, false arrest, assault and battery, or malicious prosecution because there was probable cause – or, at a minimum, arguable probable cause – for his arrest and prosecution. He cannot replead his fair trial claims because there was no "false information" in the Criminal Complaint and no exculpatory information was "withheld" from him. Nor, in the absence of any predicate violations, can he replead his claim for failure to intervene. Consequently, Claims 1-8 and 10-14 should be dismissed without leave to amend.

### H.    Claims 9 and 15 Should Be Dismissed With Leave to Amend

In his opposition brief, plaintiff withdrew Claim 9, asserted against the City and Commissioner Molina, which was his sole federal claim arising out of the conditions under which he was confined at Rikers Island. *See* Pl. Mem. at 48 ("Plaintiff withdraws without prejudice his *Monell* claim based on the conditions of confinement at Rikers Island."). He has not withdrawn Claim 15, which charges the City and Molina with negligence under state law, apparently on a vicarious liability theory, for the conditions to which plaintiff was subjected while detained at Rikers Island, "including lack of medical care." Am. Compl. ¶ 143. However, Claim 15 comes within this Court's supplemental jurisdiction only because it arises from the same "case or controversy" as plaintiff's federal claims, all of which have either been withdrawn or – for the reasons outlined above – should be dismissed. Consequently, the Court may decline jurisdiction over Claim 15 (and over any other state law claim that the Court does not reach). *See* 28 U.S.C. § 1367(c)(3) (supplemental jurisdiction may be declined where "the district court has dismissed all claims over which it has original jurisdiction").

Although the statute is phrased in discretionary terms, and there is no "mandatory rule to be applied inflexibly in all cases," *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988), in the "usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.*; *see also Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 123 (2d Cir. 2006) (reversing district court decision to retain supplemental jurisdiction over state law claims after dismissing federal claim, citing "the absence of a clearly articulated federal interest"); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

There is no discernable federal interest embedded in plaintiff's state-law negligence claim. Nor do any of the other *Cohill* factors militate in favor of this Court retaining jurisdiction over that claim. Consequently, there is no reason for this Court to vary from "the usual rule." *See Zhang v. City of New York*, 2023 WL 6316249, at *2-3 (S.D.N.Y. Sept. 28, 2023) (declining to exercise supplemental jurisdiction over plaintiffs' state-law negligence, wrongful death, and medical malpractice claims after granting summary judgment to the City on their § 1983 claim alleging inadequate medical care at Rikers Island); *Morris v. City of New York*, 2022 WL 2657220, at *4 (S.D.N.Y. July 8, 2022) (declining to exercise supplemental jurisdiction over plaintiff's state-law negligence claims after dismissing his § 1983 claims, arising out of his exposure to COVID-19 at Rikers Island, pursuant to Rule 12(b)(6)); *Houston v. Nassau Cnty.*, 2012 WL 729352, at *7 (E.D.N.Y. Mar. 7, 2012) (dismissing state-law negligence claims against Nassau County correctional officials, without prejudice, "given the absence of any federal claim that survives the motion for judgment on the pleadings"). Here too, given the absence of any cognizable federal

claim, the Court should decline to exercise supplemental jurisdiction over plaintiff's remaining state-law claim.

## III.    CONCLUSION

For the reasons set forth above, I recommend, respectfully, that defendants' motions to dismiss (Dkts. 50, 54) be GRANTED; that Claims 1-8 and 10-14 be DISMISSED with prejudice; and that Claim 9 (which plaintiff withdrew "without prejudice," *see* Pl. Mem. at 48) and Claim 15 (which is brought under state law) be DISMISSED without prejudice. I further recommend that plaintiff be permitted to replead Claims 9 and 15, concerning the conditions under which he was detained at Rikers Island, within 14 days of this Court's decision on the pending motions, but that his cross-motion for leave to amend (Dkt. 64) be otherwise DENIED.

Dated: New York, New York
        August 26, 2024

**BARBARA MOSES**
**United States Magistrate Judge**

## NOTICE OF PROCEDURE FOR FILING OF
## OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Lewis A. Kaplan at 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned magistrate judge. Any request for an extension of time to file objections must be directed to Judge Daniels. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review**. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x, 486, 487 (2d Cir. 2018) (summary order); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).